PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, on behalf of Itself and all Others Similarly Situated, Plaintiffs,

v.

LABRANCHE & CO., INC., LaBranche & Co., LLC, Michael LaBranche, Bear Wagner Specialists LLC, Spear, Leeds & Kellogg Specialists LLC, Spear, Leeds & Kellogg LP, The Goldman Sachs Group, Inc., Van Der Moolen Specialists USA, LLC, Fleetboston Financial Corporation and Fleet Specialists, Inc., Defendants.

This Document Relates To Case Nos. 03 Civ. 8521, 03 Civ. 8935, 03 Civ. 9968 and 04 Civ.2038.

No. 03 Civ.8264 RWS.

United States District Court, S.D. New York.

May 27, 2004.

Milberg Weiss Bershad Hynes & Lerach, San Diego, CA by William S. Lerach, Darren J. Robbins, Mark Solomon, Michael J. Dowd, William J. Doyle II, Milberg Weiss Bershad Hynes & Lerach Local Counsel, New York City by Melvyn I. Weiss, for Plaintiff California Public Employees' Retirement System.

Lovell Stewart Halebian by Christopher Lovell, New York City, for Empire Programs, Inc.

Wolf Popper LLP by Marian P. Roshner, Robert C. Finkel, Chet B. Waldman, Andrew E. Lencyk, New York City, for Sea Carriers.

Marc S. Henzel, Bala Cynwyd, PA, for Rosenbaum Partners.

Wilmer Cutler Pickering by Robert B. McCaw, New York City, for Defendants Speer, Leeds & Lellogg, and The Goldman Sachs Group, Inc.

## OPINION

SWEET, District Judge.

The above-captioned cases are actions for securities fraud brought on behalf of a purported class of investors [1] who claim to have sustained losses as a result of a fraudulent scheme perpetrated by Defendants, specialist firms on the New York Stock Exchange ("Specialist Defendants") [2] and the New York Stock Exchange ("NYSE") itself (collectively, "Defendants"), in violation of, *inter alia*, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Rule 10b–5 promulgated thereunder. For the reasons set forth below, each of the above-captioned actions are consolidated, the motions for appointment of CalPERS and Empire as lead plaintiff are granted, and CalPERS and Empire are hereby designated Co–Lead Plaintiffs. The motion for appointment of Sea Carriers as lead plaintiff is denied. CalPERS' and Empire's respective choices of lead counsel are approved, and Lerach Coughlin Stoia & Robbins LLP and Lovell Stewart Halebian, LLP are appointed Co–Lead Counsel. CalPERS' motion for an order directing the preservation of relevant

---

1. The complaint filed in *Rosenbaum Partners, LP v. The New York Stock Exchange, Inc., et al.*, No. 04 Civ.2038(RWS), is an individual action and not brought on behalf of a purported class of investors.

2. The Specialist Defendants named in one or more of the various complaints are LaBranche & Co., Inc., LaBranche & Co., LLC, Michael LaBranche, and George M.L. LaBranche, IV (collectively, "LaBranche"); Bear Wagner Specialists LLC ("Bear Wagner"); Spear, Leeds & Kellogg Specialists LLC and Spear, Leeds & Kellogg LP (collectively, "Spear, Leeds"); the Goldman Sachs Group, Inc. ("Goldman Sachs"); Van Der Moolen Specialists USA, LLC and Van Der Moolen Holdings N.V. (collectively, "Van Der Moolen"); FleetBoston Financial Corporation and Fleet Specialist, Inc. (collectively, "FleetBoston"); Performance Specialist Group, LLC ("Performance Specialist"); and Susquehanna Specialists, Inc. and Susquehanna International Group, LLP (collectively, "Susquehanna").

documents and other evidence relating to this litigation is denied.

## The Complaints

According to the complaints filed in these actions, trades in stocks for the NYSE's more than 2,500 listed companies are handled by one of seven specialist firms, the Specialist Defendants. All trading on the NYSE is conducted through an auction process, and each specialist firm is granted an exclusive franchise by the NYSE to conduct the auction in each of the NYSE-listed stocks assigned to that specialist firm. Specialist firms, acting through individuals known as specialists, are responsible for maintaining a two-sided auction market by providing an opportunity for public orders to be executed against each other. Under NYSE rules, specialists are prohibited from trading in their clients' stock for their own firm accounts, except when such trading is necessary to maintain a fair and orderly market in those securities. The official NYSE Display Book of each specialist firm contains all electronic orders facilitated by the NYSE's electronic order entry system, known as the Super Designated Order Turnaround System ("SuperDOT"). It is also alleged that the Specialist Defendants maintained another book containing inside information about large orders not facilitated by SuperDOT.

Under NYSE rules, specialists are required to abstain from taking part in orders to purchase or sell stocks that could be executed against each other without the specialist's intervention or involvement. This obligation is referred to as the specialists' "negative obligation," and the Specialist Defendants are alleged to have systematically violated this obligation by intervening and trading for their own firm accounts, thereby causing harm to their customers.[3] The Specialist Defendants are also alleged to have engaged in "front running," by taking advantage of their confidential knowledge of public investors' orders to trade ahead and on their own account as principals before completing the orders placed by public investors. Finally, the Specialist Defendants are alleged to have engaged in a practice known as "freezing" the specialist firm's Display Book, whereby the specialist firm freezes its Display Book on a stock so it can first engage in trades for its own account through "inter-positioning" or "front running" prior to entering and then executing public investors' orders.

The Specialist Defendants are alleged to have engaged in these activities with the knowledge and active participation of the NYSE. The complaints allege that Defendants misrepresented that the Specialist Defendants were substantially complying with the NYSE's rules and with the Exchange Act or otherwise making good-faith efforts to make the markets in particular stocks more efficient. It is also alleged that misrepresentations were made concerning the effectiveness of the NYSE's supervision of the Specialist Defendants. In addition, the complaints allege that Defendants failed to disclose that NYSE orders were not being filled at the best available prices. The Specialist Defendants are further alleged to have breached their fiduciary duties to customers, and the NYSE is alleged to have both aided and abetted in the breach by the Specialist Defendants and violated Section 6(b) of the Exchange Act. Many of the allegations contained in the complaints are based on or derived from published accounts of investigations by the U.S. Securities and Exchange Commission ("SEC") and the NYSE into alleged mishandling of customer orders by some of the specialist firms at the NYSE.

## The Movants

Several entities and individuals who claim to have sustained losses as a result of Defendants' alleged actions have moved for consolidation of the related cases and for appointment as lead plaintiffs of a class of persons or entities who purchased or sold defendants' clients' stocks either between October 17, 1998 and October 15, 2003 (the "proposed class period") or during a portion of that same time, from January 1, 2000 through December 31, 2002 (the "alternate proposed

---

**3.** Specialist Defendants are alleged to have engaged in "inter-positioning," which occurs when a specialist steps in the way of matching orders of public sellers and/or buyers of stock in order to "penny jump," in violation of the specialist firms' "negative obligation."

class period").[4] In addition, each proposed lead plaintiff has requested its choice of lead counsel in the litigation.

Generic Trading of Philadelphia, LLC ("Generic Trading"), a proprietary trading firm, moved on December 15, 2003 to consolidate the pending related cases, for appointment as lead plaintiff, and for approval of its choice of lead counsel. Generic Trading claims to have traded over 8.9 billion shares on the NYSE, having a total value of $379 billion, during the proposed class period. Generic subsequently removed itself from consideration in favor of another movant, as set forth below.

Empire Programs, Inc. ("Empire") claims to have traded over 4 billion shares of NYSE-listed stock via SuperDOT, among other means, during the alternative proposed class period, and approximately 4.5 billion shares during the longer proposed class period. Empire estimates the dollar value of its trades from 1998 through 2002 to be approximately $183 billion. Empire moved to consolidate the pending related actions, for appointment as lead plaintiff, and for appointment of lead counsel on December 16, 2003.

Market Street Securities, Inc. ("Market Street"), a specialist and market maker for options on the Philadelphia Stock Exchange, moved on December 16, 2003 to consolidate all related actions pending in this Court, for appointment as lead plaintiff, and for approval of its choice of lead counsel. Market Street claims to have traded in excess of 283 million shares of stock[5] on the NYSE, although it does not allege a specific dollar amount of losses or provide a total value of its transactions. Market Street withdrew its motion in favor of another movant, as described below.

North River Trading Company, LLC ("North River"), a privately held investment company, moved on December 16, 2003 for consolidation of the pending related cases, appointment as lead plaintiff and appointment of lead counsel. North River claims to have traded over 305 million shares of stock of NYSE-listed companies in transactions worth more than $7.8 billion during the proposed class period on behalf of its clients, who are alleged to have suffered losses as a result. After filing its initial motion papers, North River offered no opposition to the other movants.

Chet Robinson ("Robinson") moved on December 16, 2003 for consolidation of the pending related cases, appointment as lead plaintiff and appointment of lead counsel. Robinson claims to have traded some 24 million shares of NYSE-listed companies during the proposed class period. Robinson provided no opposition to the other movants.

Sea Carriers LP I ("Sea Carriers"), a limited partnership firm trading in equity securities, moved to consolidate the pending related cases, for appointment as lead plaintiff, and for approval of its choice of lead counsel on December 16, 2003. Sea Carriers claims to have traded approximately 1.3 billion shares during calendar year 2003, with a total dollar value of such trades amounting to approximately $59.9 billion.[6] Sea Carriers has not provided comparable information for the proposed class period, claiming that the production of records of trades "during the relevant period" would not be "practicable." (Affidavit of Per G. Barre, dated Dec. 16, 2003 ("Barre Aff."), ¶ 7.)

The California Public Employees' Retirement System ("CalPERS"), the largest public employee retirement system in the United States, claims to have purchased or sold approximately 2.8 billion shares of NYSE-listed stock in trades executed during the proposed class period and, as a result thereof, suffered damages. The total value of CalPERS' transactions in NYSE-listed stock during the

---

**4.** The complaint filed in *Empire Programs, Inc. v. Spear, Leeds & Kellogg Specialists LLC, et al.*, No. 03 Civ. 8935(RWS), is the sole complaint to have adopted the alternate proposed class period.

**5.** Market Street's figures represent trades during the period from January 1, 1999 through October 31, 2003.

**6.** Sea Carriers has claimed additional trades, and therefore additional losses, in its opposition brief, as set forth below.

proposed class period is approximately $98 billion. CalPERS, which filed a complaint on December 16, 2003, originally moved to consolidate four of the above-captioned cases, for appointment as lead plaintiff, for approval of its choice of lead counsel, and to preserve relevant evidence.

Thereafter, on January 6, 2004, CalPERS filed a joint memorandum along with Generic Trading and Market Street, announcing that Market Street is no longer seeking lead plaintiff status and that Generic Trading and Market Street support the designation of CalPERS as the sole lead plaintiff. The joint memorandum also announces that the alliance is seeking the appointment of both CalPERS' counsel, Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss"),[7] and Generic Trading's counsel, Entwistle & Cappucci, as co-lead counsel. CalPERS, Generic Trading and Market Street propose that if CalPERS is to be appointed lead plaintiff, Generic Trading and Market Street would, subject to the Court's approval, serve as class representatives. According to the joint memorandum, CalPERS and Generic Trading together claim a total of 11.7 billion shares traded during the proposed class period, at a value of $477 billion.

### Prior Proceedings

The first of the above-captioned actions, *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. LaBranche & Co., Inc., et al.*, No. 03 Civ. 8264(RWS), was commenced on October 17, 2003. Pursuant to 15 U.S.C. § 78u–4(a)(3)(A)(I), on that same date the plaintiff in that action caused notice to be published over the *Business Wire.* The notice indicated that applications for appointment as lead plaintiff were to be made no later than 60 days from the date of publication, or by December 16, 2003.

Empire, Generic Trading, Market Street, North River, Robinson and Sea Carriers filed motions to consolidate the related actions, to be appointed as lead plaintiffs, and to appoint lead counsel on or by December 16, 2004. CalPERS submitted its own motion on or about that same date.[8] On January 6, 2004, Empire and Sea Carriers each submitted an opposition brief to the competing movants, and CalPERS, Generic Trading and Market Street filed a joint memorandum in favor of CalPERS' appointment as the sole lead plaintiff and in opposition to the remaining movants.[9] Neither North River nor Robinson submitted any opposition, and their motions were thereafter deemed withdrawn.

After submission of all briefs, letter-briefs and various other supporting materials, the remaining motions were argued on February 11, 2004. Following the announcement of several settlements reached among the NYSE, the SEC and certain of the Specialist Defendants, Empire and Sea Carriers submitted letters to the Court dated, respectively, March 30, 2004 and April 1, 2004, and CalPERS requested leave to file a response to those letters on April 9, 2004. CalPERS' request having been granted, Sea Carriers then requested and was granted leave to file a sur-response, which was submitted on April 28, 2004. The competing motions were thereupon deemed fully submitted.[10]

### I. The Related Cases Are Consolidated

■ CalPERS, Empire and Sea Carriers have each moved to consolidate some or all of

---

7. After the instant motions were submitted, the law firm known as Milberg Weiss announced its division into two separate law firms as of May 1, 2004: Milberg Weiss Bershad & Schulman LLP, with a main office in New York, New York, and Lerach Coughlin Stoia & Robbins LLP, with its main office in San Diego, California. *See generally* Anthony Lin, *Milberg Weiss Completes Separation Into Two Firms*, N.Y.L.J., May 4, 2004, at 1 (col.4). Although this opinion may refer to "Milberg Weiss" in accordance with the papers submitted, it is understood that CalPERS is represented by Lerach Coughlin Stoia & Robbins LLP. (*See* CalPERS Mem. at 2 n. 2 ("The original complaint in this action was filed by Milberg Weiss West and the retention by CalPERS and

preparation of the CalPERS complaint has been with Milberg Weiss West exclusively.").)

8. *See* Part II, Section A *infra.*

9. Market Street specifically withdrew its own motion in the text of the joint opposition memorandum. Generic Trading did not so enunciate its withdrawal, but by announcing its support for CALPERS' motion as sole lead plaintiff its own candidacy is effectively withdrawn.

10. Submissions from certain of the movants were received after this time but will not be addressed here.

the above-captioned related cases.[11] Each of these actions involves class action claims brought on behalf of class members who traded stock on the NYSE during the proposed class period or a portion of that period. Each of the actions asserts essentially similar and overlapping claims and involves common issues of law and fact, in that each action alleges that some or all of Defendants engaged in a fraudulent scheme that violated the specialist firms' "negative obligations" and/or engaged in "front running" to the detriment of plaintiffs and other members of the proposed class, in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b–5 promulgated thereunder, among other things.

■ Consolidation is appropriate when, as here, there are actions involving common questions of law or fact. *See* Fed.R.Civ.P. 42(a); *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990). That certain defendants are named in only one or some of the complaints does not require a different result. *See Pinkowitz v. Elan Corp., PLC*, Nos. 02 Civ. 865(WK) *et al.*, 2002 WL 1822118, at *3 (S.D.N.Y. July 29, 2002) ("[A]lthough certain class actions here name defendants not otherwise present in the other class actions, 'consolidation is not barred simply because the actions to be consolidated allege claims against different parties.' ") (quoting *Skwortz v. Crayfish Co., Ltd.*, Nos. 00 Civ. 6766(DAB) *et al.*, 2001 WL 1160745, at *2 (S.D.N.Y. Sept. 28, 2001), *reconsideration granted in part on other grounds sub nom., In re Crayfish Co. Sec. Litig.*, No. 00 Civ. 6766(DAB), 2002 WL 1268013 (S.D.N.Y. June 6, 2002)); *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F.Supp. 1196, 1211 (S.D.N.Y.1992) ("The fact that there are different parties in this action does not mean this case should not be consolidated."). Nor do differences among the class periods proposed preclude consolidation. *See Skwortz*, 2001 WL 1160745, at *2 n. 3 (citing *In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 293 (E.D.N.Y.1998)).

Accordingly, the four above-captioned cases are hereby consolidated under the caption *In re NYSE Specialists Securities Litigation*, and the files of these consolidated actions shall be maintained in one file under Master File No. 03 Civ. 8264(RWS). In addition, and for similar reasons as those stated above, the Court hereby consolidates a fifth related class action, *Rosenbaum Partners, LP v. NYSE et al.*, No. 04 Civ.2038(RWS), commenced on March 16, 2004. *See Devlin v. Transp. Communications Int'l Union*, 175 F.3d 121, 130 (2d Cir.1999) ("A district court can consolidate related cases under Federal Rule of Civil Procedure 42(a) *sua sponte.*"). All actions now pending in, subsequently filed in or transferred to this District that arise out of or are related to the same facts as alleged in the above-referenced actions may be consolidated for all purposes upon· application to this Court.

## II. Empire and CalPERS Are Appointed Co–Lead Plaintiffs

■ In 1995, Congress enacted the Private Securities Litigation Reform Act (the "PSLRA") in order to address perceived abuses in securities fraud class actions. *See* S.Rep. No. 104–98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679 ("Senate Report"); H.R. Conf. Rep. No. 104–369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 ("House Report"). The PSLRA was intended to prevent "lawyer-driven" litigation, and to ensure that parties with significant financial interests in the litigation "will participate in the litigation and exercise control over the selection and actions of plaintiffs counsel." *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 43–44 (S.D.N.Y.1998) (quoting House Report at 731); *see also In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) ("*In re Initial Public Offering I*"); *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157–58 (S.D.N.Y.1997). This goal could best be achieved, according to Congress, by encouraging institutional investors to serve as lead plaintiffs. *See Sofran v. LaBranche*

---

**11.** Empire and Sea Carriers have moved for the consolidation of three out of the five above-captioned cases, as CalPERS' action was commenced on December 16, 2003, contemporane-ous with the filing of Empire's and Sea Carriers' respective motions. CalPERS has moved for the consolidation of all four class actions pending as of the time of its motion.

& Co., Inc., 220 F.R.D. 398, 403 (S.D.N.Y. 2004); In re Oxford Health Plans, 182 F.R.D. at 46.

Accordingly, the PSLRA amends the Exchange Act [12] by, among other things, setting forth a procedure governing the appointment of a lead plaintiff or plaintiffs in "each action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. §§ 78u–4(a)(1) & 78u–4(a)(3)(B).

## A. The Notice and Filing Requirements Are Satisfied

First, the plaintiff who files the initial action must, within 20 days of filing the action, publish a notice to the class informing class members of their right to file a motion for appointment as lead plaintiff. 15 U.S.C. § 78u–4(a)(3)(A)(i). As indicated above, the plaintiff in the first-filed action here caused notice to be published over the Business Wire on October 17, 2003. (See, e.g., Affidavit of Christopher J. Gray, dated Dec. 16, 2003 ("Gray Aff."), Ex. 1.) As Business Wire is a suitable vehicle for meeting the statutory requirement that notice be published, see, e.g., Weltz v. Lee, 199 F.R.D. 129, 130 (S.D.N.Y.2001); Greebel v. FTP Software, Inc., 939 F.Supp. 57, 62–64 (D.Mass.1996), and no challenges to the adequacy of the October 17, 2003 notice have been raised, the notice requirement is deemed satisfied.

 Within 60 days after publication of the required notice, any member or members of the proposed class may apply to the Court to be appointed as lead plaintiff(s). 15 U.S.C. §§ 78u–4(a)(3)(A)–(i)(II) & 78u–4(a)(3)(B). Both Empire and Sea Carriers so moved on December 16, 2003, the last of the applicable 60 days. While CalPERS filed a complaint on December 16, its motion papers have not appeared on the docket of any of the above-captioned cases, although courtesy copies were received by this Court on December 17, 2003. CalPERS' motion will not be denied based on what appears to be a docketing irregularity, nor will the possibility that the motion papers were filed one day late be determinative here.[13] Although courts may, and have, deemed class members ineligible to serve as lead plaintiff based solely on the tardiness of their filings, see Schulman v. Lumenis, Ltd., Nos. 02 Civ. 1289(DAB) et al., 2003 WL 21415287, at *4 (S.D.N.Y. June 18, 2003) (collecting cases); Carson v. Clarent Corp., No. 01 Civ. 3361(CRB), 2001 WL 1782712, at *2 (N.D.Cal. Dec. 14, 2001) (same), CalPERS' motion will not be denied further consideration on that basis.

## B. Empire and CalPERS Are Presumed To Be The Most Adequate Plaintiffs

The PSLRA next provides that within 90 days after publication of the notice, the Court shall consider any motion made by a class member and shall appoint as lead plaintiffs the member or members of that class that the Court determines to be most capable of adequately representing the interests of the class members. 15 U.S.C. § 78u–4(3)(B)(i). In determining the "most adequate plaintiff," the PSLRA provides that:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that -
>
> (aa) has either filed the complaint or made a motion in response to a notice . . . ;
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

---

**12.** As the PSLRA amended both the Securities Act of 1933 and the Securities Exchange Act of 1934, cases arising under either statute may provide guidance in interpreting and applying the PSLRA. See Schulman v. Lumenis, Ltd., Nos. 02 Civ.1989(DAB) et al., 2003 WL 21415287, at *2 n. 5 (S.D.N.Y. June 18, 2003) (citing Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838, 843 (2d Cir.1971)).

**13.** Although, at the time of its motion, CalPERS was represented by the same law firm that caused the October 17, 2003 notice to be published, there is some suggestion in CalPERS' motion papers and accompanying affidavits of service executed on December 16, 2003, that CalPERS may have erroneously believed December 17, 2003 to be the last of the applicable 60 days. (See Affidavit of Michael J. Dowd, dated Dec. 15, 2003, ¶ 2 (listing the publication date of the statutory notice as October 18, 2003).)

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I); *see also Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y.2003); *Albert Fadem Trust v. Citigroup, Inc.*, 239 F.Supp.2d 344, 347 (S.D.N.Y.2002).

Each of the remaining movants[14] for appointment as lead plaintiff has satisfied the first requirement. CalPERS and Empire have both filed complaints and submitted motions for lead plaintiff status. Sea Carriers has not filed a complaint but has submitted a motion for appointment as lead plaintiff in response to the notice published on October 17, 2003. It is not immediately evident, however, how to assess which of the movants has the "largest financial interest" in the relief sought by the class in this execution price fraud action.

### 1. Empire and CalPERS Have the Largest Financial Interests

In many securities fraud class actions, an investor purchases shares of a specific security at a price later alleged to be inflated by one or more defendants' violations of the federal securities laws. In order to assess the relative financial interests of various candidates for lead plaintiff in such a case, and in the absence of any explicit guidance from either the higher courts or Congress,[15] a number of courts have adopted a four-factor test first promulgated in *Lax v. First Merchants Acceptance Corp.*, Nos. 97 Civ. 2715 *et al.*, 1997 WL 461036 (N.D.Ill. Aug. 11, 1997). According to the *Lax* test, a candidate's financial interest may be determined by looking to (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approxi-

mate losses suffered. *Lax*, 1997 WL 461036, at \*5; *see also Schulman*, 2003 WL 21415287, at \*5 (applying four-factor test); *In re Initial Public Offering I*, 214 F.R.D. at 121 (same); *In re Crayfish*, 2002 WL 1268013, at \*4 (same); *In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 295 (E.D.N.Y. 1998) (same); *cf. In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir.2001) ("*Cendant II*") (noting approval of a variation of the *Lax* test). *See generally* 7 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 22:5 (4th ed. 2002 & Supp.2003) (describing *Lax* test).

While certain other courts have declined to follow the *Lax* test, they have done so in favor of a test that focuses on one or more of the factors identified in *Lax*. *See, e.g., In re Critical Path, Inc.*, 156 F.Supp.2d 1102, 1107–08 (N.D.Cal.2001) (adopting an approach according to which the number of net shares purchased during the class period is determinative, as supplemented with in/out losses); *In re Network Assocs., Inc. Sec. Litig.*, 76 F.Supp.2d 1017, 1027 (N.D.Cal. 1999) ("The test simply reduces to the net number of shares bought and sold during the class period."); *cf. In re Ribozyme Pharms., Inc. Sec. Litig.*, 192 F.R.D. 656, 660 (D.Colo. 2000) (employing the retention value method, "the most common method for determining financial interest pursuant to the PSLRA," but noting that the *Lax* factors "fortify the viability of this general rule and uncover the reasons behind its application").

Unlike the majority of open market fraud or investment loss class actions brought under the federal securities statutes, the class actions consolidated here do not allege wrongdoing with respect to a single security or a discrete set of securities. Rather, the complaints filed in the four pending actions allege, *inter alia*, violations of the federal securities laws purported to have affected a presently unknown number of the securities

---

**14.** As Generic Trading and Market Street have not made any motion in support of CalPERS' appointment as lead plaintiff, much less one within the statutory 60–day period under 15 U.S.C. § 78u–4(a)(3)(A)(i), neither Generic Trading nor Market Street may be considered movants here.

**15.** Neither Congress, *see In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 295 (E.D.N.Y.1998) (citing *Lax v. First Merchants Acceptance Corp.*, Nos. 97 Civ. 2715 *et al.*, 1997 WL 461036, at \*5 (N.D.Ill. Aug. 11, 1997)), nor the Supreme Court, nor the Second Circuit has developed a definitive standard for assessing which claimant has the "largest financial interest" in a federal securities class action.

traded on one of the nation's leading stock exchanges. Similarly, these consolidated actions do not seek relief as the result of a series of purchases at an inflated price or even purchases discounted by sales, but instead seek relief for fraud alleged to have affected the execution price for trades involving both purchases and sales of stock, confounding the traditional loss calculations. Finally, as distinct from the typical open market fraud or investment loss scenario where, after a fraud has been revealed or a misrepresentation rectified, a stock's adjusted price can enable a plaintiff to estimate potential losses and compare its losses to those of other investors, in the cases consolidated here there appears to be no readily identifiable baseline execution price with which to measure the losses alleged.

In light of these differences, it is apparent that, at the very least, the calculus to be performed in determining which movant here has the greatest financial interest in the relief sought will differ significantly from that conducted in open market fraud or investment loss cases. Indeed, the Specialist Defendants have suggested that no such calculation may be performed at all, at least not based on the information currently available to the Court.

### a. It Is Appropriate to Appoint Lead Plaintiffs

██ In a letter-brief addressed to this Court, submitted on February 5, 2004, the Specialist Defendants argue that:

A fundamental problem besets all of the lead-plaintiff motions, and, indeed, all of the complaints: They fail to specify what securities were the subject of the alleged wrongdoing and which of those securities movants purchased. Without this most basic of information it is impossible to perform the analysis required by the PSLRA. The Court cannot determine which movant has the greatest financial stake in the purported claims, which movant is the most adequate or typical plaintiff, or even whether any movant has standing to pursue these claims.

(Letter of Robert B. McCaw to the Court, dated Feb. 5, 2004 ("Specialist Def. Letter"),

at 1.) By way of example, none of the movants, according to the Specialist Defendants, has complied with the requirement set forth in 15 U.S.C. § 78u–4(a)(2)(A)(iv), which directs plaintiffs to submit a certificate with their complaint that " 'sets forth all the transactions of the plaintiff[s] in the security[ies] that [are] the subject of the complaint during the class period.' " (Specialist Def. Letter at 2 (quoting 15 U.S.C. § 78u–4(a)(2)(A)(iv)).) In the absence of certificates satisfying this requirement, the Specialist Defendants argue, "there is a substantial risk that the Court will select a lead plaintiff that did not actually purchase securities affected by the alleged conduct, or only purchased a few of the allegedly affected securities. Such a lead plaintiff would lack standing to pursue claims based on any securities that were not purchased by that lead plaintiff." (Id. at 4.)

Nor, as the Specialist Defendants explain, is reference to each movant's aggregate trades on the NYSE an adequate basis for assessing financial interest, because the complaints consolidated here do not allege that every security traded on the NYSE was affected by the purported wrongdoing. Indeed, "the sources on which movants rely suggest that, at most, only a small portion of the thousands of different securities traded on the Exchange are at issue in the investigations [by the SEC and the NYSE] that form the basis of the purported claims." (Id. at 2.) Moreover, the Specialist Defendants note, not all specialist firms were named in all of the complaints, suggesting that some trades on the NYSE are not alleged to have been subject to any wrongdoing.

As a result, the Specialist Defendants propose that a ruling on the competing motions for lead plaintiff be deferred until the movants can supply the relevant information concerning the securities and trades at issue. Based on the current record, the Specialist Defendants contend, "the Court can make little more than a wild guess on the central issues in the lead-plaintiff contest. Moreover, there is no good reason to rush forward without more information." (Id. at 3.)

As there has been previous occasion to note, the process by which a lead plaintiff is selected "work[s] better with more informa-

tion than less." *King v. Livent, Inc.*, 36 F.Supp.2d 187, 191 (S.D.N.Y.1999) (relying in part on information provided by defendants in deciding a motion for lead plaintiff appointment). In that spirit, and for lack of any clear statutory language in the PSLRA precluding or limiting the right of defendants to be heard on the issue of lead plaintiff and lead counsel designations, defendants have standing to be heard during the appointment process. *See id.* at 190–91; *see also Howard Gunty Profit Sharing v. Quantum Corp.*, No. 96 Civ. 20711(SW), slip op. at 7 (N.D. Cal. Feb. 6, 1997) ("In sum, permitting defendants to make a limited facial challenge to a plaintiff's motion for appointment of lead plaintiff does not disrupt the statutory framework Congress set forth in § 78u–4(a)(3)(B)(iii). Rather it is consistent with the goal of alleviating the abuses of the class action device in securities litigation.").[16] The letter-brief by the Specialist Defendants was submitted after the conclusion of the briefing schedule but will be considered, since a court may, *sua sponte*, consider the issues a defendant raises in this context. *See Fields v. Biomatrix, Inc.*, 198 F.R.D. 451, 454 (D.N.J. 2000) (observing that courts have disagreed as to whether defendants have standing to oppose a lead plaintiff motion, but concluding that, even if defendants lack standing, the court may, *sua sponte*, consider the issues raised by them); *In re First Union Corp. Sec. Litig.*, 157 F.Supp.2d 638, 641 (W.D.N.C. 2000) (declining to reach the issue of whether defendants have standing to object to a lead plaintiff appointment, but holding that, "[r]egardless of whether Defendants formally have standing . . ., nothing in the Reform Act prevents this Court from considering the arguments raised and authorities cited by Defendants.").

Turning, then, to the issues raised by the Specialist Defendants, it bears noting that they "take no position on which movant should be lead plaintiff." (Specialist Def. Letter at 1.) Rather, the Specialist Defendants suggest only that any decision on the competing motions be deferred until movants have provided the information that the Specialist Defendants argue is critical to reaching a determination on the issue of lead plaintiff. As set forth below, this procedure will not be adopted.

■ In the first place, while the Specialist Defendants claim that "there is no good reason to rush forward without more information" (*id.* at 3), the contrary is true. In general, the appointment of a lead plaintiff pursuant to the PSLRA should be done in an expeditious manner, in keeping with 15 U.S.C. §§ 78u–4(a)(3)(A)(i)(II) and 78u–4(a)(3)(B)(i). *See In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 440 (S.D.Tex.2002) (noting that the PSLRA "evidences Congress' intent to expedite the [appointment] process"); *In re MicroStrategy Inc. Sec. Litig.*, 110 F.Supp.2d 427, 433 n. 12 (E.D.Va. 2000) (stating that Congress intended "that the lead plaintiff be appointed as early in the litigation as possible"); *In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d 803, 818–19 (N.D.Ohio 1999) ("The obvious intent of these provisions is to ensure that the lead plaintiff is appointed at the earliest possible time, and to expedite the lead plaintiff process."). Although under certain circumstances there may be good cause to postpone appointment of lead plaintiff, such is not the case here.

Second, although certain approaches to determining the largest financial interest have been widely adopted in other securities fraud cases as noted above, in the absence of statutory guidance or Second Circuit case law,[17] the method used and the factors considered

---

**16.** There is a split of authority on the issue of whether a defendant has standing to oppose a motion pursuant to the provisions of the PSLRA to appoint a lead plaintiff and class counsel in a federal securities class action, such as this. *Compare King v. Livent*, 36 F.Supp.2d 187, 190 (S.D.N.Y.1999) (comparing cases with contrary holdings and concluding that "nothing in the text of the Reform Act precludes or limits the right of defendants to be heard on [the appointment of lead plaintiff and class counsel]") *with Holley v.*

*Kitty Hawk, Inc.*, 200 F.R.D. 275, 277 (N.D.Tex. 2001) (observing that courts have generally refused to permit defendants to weigh in on the adequacy or typicality of proposed lead plaintiffs but have permitted defendants to challenge the failure of a named plaintiff to file a certificate or the adequacy of plaintiff's notice) (collecting cases).

**17.** *See supra* note 15.

in determining each movant's financial interest remain fully within the discretion of the district court. Thus, while the aggregate trades theory adopted with certain variations by each of the remaining movants may be novel and even—insofar as it later may be demonstrated to be over-inclusive—imprecise, it does permit a comparison among the candidates for lead plaintiff on the basis of an assumed probability. That a comparison based on aggregate trades could be premised in part on trades involving securities that may turn out not to be, as the Specialist Defendants suggest, the *"relevant ones"* (Specialist Def. Letter at 3) does not, in and of itself, counsel against employing this comparison at this early phase of the litigation. Moreover, no argument has been advanced by the movants that adopting an aggregate trades approach will distort any one movant's actual financial interest in a manner disproportionate to its effect on other movants.

Similarly, while the information provided in certificates completed pursuant to 15 U.S.C. § 78u–4(a)(2)(A) doubtless plays a

significant part in the appointment process in many cases, *see, e.g., In re Cable & Wireless, PLC Sec. Litig.,* 217 F.R.D. 372, 376 (E.D.Va.2003) (concluding that a lead plaintiff candidate was adequate based in part on his submission of a certificate), it is unsettled whether a candidate for lead plaintiff who has not filed a complaint is even required to submit such a certificate.[18] In light of this dispute and of the court's acknowledged discretion in conducting the appointment process,[19] the existence or adequacy of any certificates submitted here will not be considered a determinative factor at this stage, whatever the import of a certificate's adequacy may be at a later portion of the proceedings. *See In re Initial Public Offering,* 241 F.Supp.2d 281, 347 n. 76 (S.D.N.Y.2003) (*"In re Initial Public Offering II"*) (holding that the certification required by the PSLRA was "integral to the complaint" and could therefore be considered on a motion to dismiss).

Finally, to the extent the Specialist Defendants' submission invites a consideration of

**18.** *Compare Aronson v. McKesson HBOC, Inc.,* 79 F.Supp.2d 1146, 1155 (N.D.Cal.1999) (concluding that only those filing a complaint need complete a certification, since "[i]t seems strained to recast the words 'filed with the complaint' to mean 'filed with the complaint or motion.' ... [W]hile it might better effect Congress's overall goals of litigation reform to require a certification to be filed with the motion, the legislative history indicates that Congress knew that it was limiting the certification requirement to those who file complaints."); *Blaich v. Employee Solutions, Inc.,* No. 97 Civ. 545 (PHX–RGS), 1997 WL 842417, at *2 (D.Ariz. Nov. 21, 1997) (concluding that a lead plaintiff candidate who did not file a complaint was not required to file a certification under the PSLRA); *Greebel v. FTP Software, Inc.,* 939 F.Supp. 57, 61 (D.Mass.1996) ("In light of the detailed revision of procedures under the PSLRA, this omission [to require that a certification be filed with a motion to be appointed lead plaintiff] does not appear to be an oversight. Moreover, limiting the certification requirement to parties filing complaints is consistent with the Congressional purpose underlying the PSLRA ... to slow the race to the courthouse by so-called professional plaintiffs.") (internal citation omitted), *with In re Versata, Inc. Sec. Litig.,* Nos. 01 Civ. 1439(SI) *et al.,* 2001 WL 34012374, at *2 (N.D.Cal. Aug. 20, 2001) ("Under the procedures set out in the PSLRA, all proposed lead plaintiffs must have submitted a sworn certification...."); *Burke v. Ruttenberg,* 102 F.Supp.2d 1280, 1319 (N.D.Ala.2000)

("The certification requirement is applicable not only to those who file complaints, but to those who move to be appointed lead plaintiff. Only those plaintiffs who satisfy the certification requirement of the subsection can serve as lead plaintiff.") (internal citation omitted); *Chill v. Green Tree Fin. Corp.,* 181 F.R.D. 398, 410 (D.Minn.1998) ("Congress intended the provision of certifications in conjunction with a Lead Plaintiff Motion.... It would be anomalous, if not perverse, to require sworn certifications from only the plaintiffs named in a complaint, but then allow other persons to be appointed as Lead Plaintiffs, without attesting to any of the information adjudged appropriate to that standing, by Congress.").

**19.** Even if certificates were required of every candidate for lead plaintiff, the Court could arguably waive such a requirement or any inadequacies in the certificates themselves. "Although the procedures contemplated by the PSLRA are well defined, district courts have not followed them invariably, especially when doing so would fail the court's ultimate obligation to appoint as lead plaintiff the member or members of the purported plaintiff class who are 'most capable of representing the interests of the class members.' " *In re Versata,* 2001 WL 34012374, at *3 (citing *In re Baan Co. Sec. Litig.,* 186 F.R.D. 214, 215 (D.D.C.1999); *Yousefi v. Lockheed Martin Corp.,* 70 F.Supp.2d 1061, 1070 (C.D.Cal.1999)).

the sufficiency of the consolidated complaints or of the viability of the movants' aggregate trades theories, the invitation is premature.

Nonetheless, several of the concerns voiced by the Specialist Defendants suggest the possibility that, over the course of this litigation, information may come to light or other reasons develop indicating the need to revisit the lead-plaintiff designation reached here. Should circumstances evolve in such a manner, the decision reached here regarding appointment of lead plaintiff and lead counsel may be re-opened. *See Z–Seven Fund, Inc. v. Motorcar Parts & Accessories,* 231 F.3d 1215, 1218 (9th Cir.2000) ("[T]he district court's order designating a lead plaintiff is not a conclusive, immutable determination of the issue. It can be revisited if circumstances warrant."); *In re Oxford Health Plans,* 182 F.R.D. at 51 (reserving the right to alter a co-lead plaintiff structure "at any time and for any reason"); *cf. Greebel,* 939 F.Supp. at 60 ("[T]his court also concludes that its determination to appoint a person or persons as lead plaintiff must be without prejudice to the possibility of revisiting that issue in considering a motion for·class certification.") (citation omitted). *See generally Metro Services Inc. v. Wiggins,* 158 F.3d 162, 165 (2d Cir.1998) (holding that an order appointing a lead plaintiff was not conclusive and not appealable where the district court had specifically reserved the right to revisit the designation).

#### b. *Empire and CalPERS Are Appropriate Lead Plaintiffs*

■ Each of the remaining movants here acknowledges that, due to the nature of the practices alleged and the extent of information currently available, it is difficult if not impossible to identify which securities and which trades in those securities were affected by the alleged wrongdoing. Each agrees that the best way to determine a claimant's relative financial interest is to assess the movant's aggregate trading of NYSE shares on the theory that a movant's aggregate trading represents the outer limit of its vulnerability to harm as a result of the misconduct alleged. The movants disagree, however, as to which types of transactions—market orders, limit orders, or other types—and which size transactions form the subject of the consolidated complaints and are more likely to have been affected by the Defendants' alleged conduct or omissions.[20] Moreover, the movants' papers do not establish a clear consensus regarding the measure by which aggregate trading—and, thus, financial interest—is to be evaluated, as among the number of transactions, the number of shares traded, or the total value of those transactions.

Despite the differing views as to what sort of trades constitute the subject of the complaints and therefore may be used to characterize the relief sought on behalf of the class, the consolidated complaints' allegations may be read liberally to encompass a variety of trading activities, including trades placed over SuperDOT as well as trades placed on the NYSE in other manners. Consequently, the particular method by which a transaction was executed on the NYSE will not bar any one of the movants from establishing its fi-

---

**20.** CalPERS has submitted affidavits opining that larger limit orders are likely to be more damaged (proportionately) than smaller market orders from the wrongdoing alleged, but admitting that it is "too early in the stage of this litigation to say with certainty whether" this is so. (Third Affidavit of Brian C. Becker, dated Apr. 6, 2003, ¶ 3.) According to CalPERS, the recent settlements reached by the NYSE, the SEC and certain of the Specialist Defendants support the view that transactions involving a larger number of shares, of the type that CalPERS engaged in, are proportionately more damaged than smaller orders of the type placed by both Empire and Sea Carriers. Since these large block transactions are the most susceptible to the harms alleged, CalPERS claims, they are the most relevant types of trades for the purposes of assessing financial interest in the relief sought by the class.

Sea Carriers and Empire, meanwhile, have each submitted materials opining that market orders were likely to be proportionately more damaged from the Specialist Defendants' purported actions. They have each also claimed that their market order transactions, placed via SuperDOT, are precisely the type of transactions that were the subject of the NYSE and SEC settlements, and hence the most relevant type of transactions for the present analysis. Empire further argues that its high volume of transactions relative to those of investors like CalPERS renders it more susceptible to the wrongdoing alleged.

nancial interest in the relief sought by the class.

Each of the movants has also argued at length that certain sizes and types of transactions are more likely to be affected by the fraud alleged than others and each has provided opinions by purported experts in support of their respective arguments of disproportionate damage.[21] At present, there is insufficient evidence to resolve this issue. However, rather than ignore these potentially significant differences among the movants, under the circumstances of the present allegations and record it is appropriate to consider both the movant that has asserted the greatest financial interest in large volume limit order transactions and the movant that has asserted the greatest financial stake in market order transactions placed via Super-DOT.

Another issue relating to the evaluation of financial interest here concerns the appropriate measure for aggregate trading. Relying on the aggregate number of transactions as the measure of financial interest emphasizes the activities of high frequency traders, such as Empire or Sea Carriers, and may not accurately reflect the relative importance of large block trading, such as that accomplished by CalPERS. The two-track approach to assessing financial interest adopted above alleviates some of the concern that a calculation guided by the quantity of transactions may disproportionately favor high frequency traders.

Measuring financial interest by either the number of shares traded during the proposed class period or the total value of those transactions provides a more balanced method for comparing the movants here. As the value of the various transactions arguably reflects additional factors not directly pertinent to this analysis, the number of shares each movant has traded on the NYSE during the proposed class period appears to be the most appropriate and seemingly anodyne measure with which to determine each movant's financial interest in this litigation.

Under such an analysis, Empire appears to have the largest financial interest related to market order transactions placed over Super-DOT. Empire claims to have traded over 4.5 billion shares of NYSE stocks via SuperDOT during the proposed class period through market order transactions. In support of its claim, Empire has submitted its trading records from September 1998 through November 2003. (Gray Aff., Ex. 4.)

CalPERS, the movant with the next largest number of shares transacted, appears to have the sole, and therefore greatest, financial interest related to large block order transactions among the remaining movants. CalPERS claims in its moving papers to have engaged in purchase and sale transactions involving 2.83 billion shares of NYSE-listed stocks during the proposed class period, as summarized in transaction data submitted in support of its motion.[22] (Affidavit of Michael J. Dowd, dated Dec. 15, 2003 ("Dowd Aff."), Ex. D.)

Based on its moving papers, Sea Carriers appears to have the third largest financial interest among the movants here, and the second largest financial interest in market order transactions placed via SuperDOT. Sea Carriers claims to have traded approximately 1.3 billion shares through market order transactions on SuperDOT in calendar year 2003 alone.[23] (Barre Aff., ¶ 4.)

---

21. *See supra* note 20.

22. CalPERS has not specified what portion of the NYSE-listed stocks it has traded were actually exchanged in transactions executed on the NYSE and, thus, were arguably vulnerable to the wrongdoing alleged in the consolidated complaints. If, as Sea Carriers argues, as much as twenty percent of NYSE-listed stocks are traded outside the NYSE, CalPERS' trading figure would need to be discounted appropriately, although any such discount would not alter the relative financial status of CalPERS in the analysis undertaken here.

23. It is unclear from Sea Carriers' motion papers whether, with this amount and the other transactional figures offered "by way of illustration" (Sea Carriers Mem. at 10), Sea Carriers is inviting extrapolation from the 2003 figures in order to arrive at an estimate for Sea Carriers' transactions throughout the proposed class period, or whether these figures represent Sea Carriers' transactional total. Although the process of assessing relative financial interests in the context of an execution price fraud class action necessarily depends on certain estimations, transactions will not be assumed to exist where none have been alleged.

These assessments need not be altered as a consequence of the claims made for the first time by both CalPERS and Sea Carriers in their opposition papers.

Sea Carriers for the first time in its opposition papers stated that, prior to 2003, "Sea Carriers Corporation, an affiliate of the movant Sea Carriers, traded a managed account, using Empire's capital and Sea Carriers' proprietary trading model pursuant to a joint venture in which Empire and Sea Carriers split profits and losses on a 50%–50% basis. Accordingly, Sea Carriers has a 50% ownership of Empire's claimed damages." (Sea Carriers Opp. Mem. at 5–6 (internal citation omitted); Supplemental Affidavit of Per G. Barre, dated Jan. 6, 2004 ("Barre Supp. Aff."), ¶ 3, 6–7.) Sea Carriers therefore claims to have a financial interest in an additional 2.25 billion shares apart from those shares already identified.[24] Empire disputes Sea Carriers' claim on the ground that Sea Carriers is a distinct entity from the entity which acted as a trading advisor to Empire and that the entity to which Sea Carriers refers had a simple contractual right to compensation keyed to the amount of profits obtained from only a portion of Empire's trades, namely the portion as to which the entity advised. (Declaration of Robert Alan Martin, dated Jan. 16, 2004, ¶ 8.) According to Empire, Sea Carriers' affiliated entity had no contractual or other responsibility to pay for the losses on the trades as to which it advised. (*Id.*, ¶ 9.) Thus, "Empire and Empire alone suffered its losses and owns its claim in this litigation." (*Id.*, ¶ 11.)

While, under certain circumstances, movants may be permitted to clarify or further document their losses or correct any inaccuracies after their initial filing, "many courts have not allowed movants to supplement their motions to enhance their loss after expiration of the sixty-day period." *In re MicroStrategy,* 110 F.Supp.2d at 433 n. 12; *see also Singer v. Nicor, Inc.,* Nos. 02 Civ. 5168 *et al.,* 2002 WL 31356419, at *3 (N.D.Ill. Oct. 17, 2002) (declining to consider two movants' amendments of their amount of financial loss

when the amendments were made after the 60–day filing deadline and reflected an increase in the amount of each candidate's loss); *In re Telxon,* 67 F.Supp.2d at 818 ("The plain language of the [PSLRA] precludes consideration of a financial loss asserted for the first time in a complaint, or any other pleading, for that matter, filed *after* the sixty (60) day window has closed.") (emphasis in original).

Even assuming that the arrangement Sea Carriers describes existed (a fact that Empire adamantly disputes), Sea Carriers' assertion of additional alleged losses will not be considered in assessing the movants' relative financial interests since, as one court has explained, the supplementation of a movant's losses "is not contemplated by the PSLRA ... [and] supplementation after the expiration of the sixty (60) day period would not only be inconsistent with the language and purposes of the PSLRA, but would effectively nullify the time limits expressly provided therein." *In re Telxon,* 67 F.Supp.2d at 819. Moreover, Sea Carriers has not offered a satisfactory explanation as to why it failed to set out its purported portion of Empire's losses in its original motion or, indeed, why its belated attempt to increase the size of its losses is anything other than an "attempt to manipulate the size of [its] losses based on information available to it at the time of its original lead plaintiff motion." *Id.* As a result, Sea Carriers' assertion of supplemental trading figures in its opposition papers will be disregarded.

The alteration in the financial interest analysis proposed by CalPERS, while posing somewhat similar problems of timeliness, is distinct. In its opposition brief, CalPERS joins with Generic Trading and Market Street, forming an alliance in favor of CalPERS' appointment as lead plaintiff. In support of this appointment, CalPERS adds Generic Trading's transactional data to its own, thus presenting as the "CalPERS/Generic Total" 11.7 billion shares either purchased or sold during the proposed class period with a

---

24. Sea Carriers appears to have arrived at this figure by splitting the totality of Empire's claim in half (*see* Sea Carriers Opp. Mem. at 2), with no regard to the fact that Empire's figures spans

the entire proposed class period, including a substantial portion of calendar year 2003, during which time Sea Carries does not claim that its affiliate engaged in a joint venture with Empire.

dollar value of $477 billion.[25] (Joint Opp. Mem. at 2.) Based on this total, CalPERS, Generic Trading and Market Street argue together that "[n]o other lead plaintiff applicant has documented this massive financial interest in the relief sought by the Class in this case." (*Id.* at 16.)

■ What CalPERS and its cohort appear to ignore, however, is that CalPERS may not claim a financial interest in another class member's trades simply by virtue of fielding an alliance with that class member; any conclusion to the contrary would risk distorting the meaning of the "financial interest" requirement beyond recognition.[26] Nor may Generic Trading lend its shares for aggregation with a proposed lead plaintiff when it is not itself proposing to serve as co-lead plaintiff.[27] As Sea Carriers notes, CalPERS' counsel, Milberg Weiss, successfully argued against precisely such an arrangement in *In re Enron Corp. Securities Litigation*, 206 F.R.D. 427 (S.D.Tex.2002), where the court "agree[d] with counsel for the Regents of the University of California [Milberg Weiss] that Alabama's losses should not be counted as part of the State Retirement Systems Group's because it is not applying as a co-Lead Plaintiff."[28] *In re Enron Corp.*, 206 F.R.D. at 454 n. 32; *see also In re Ribozyme Pharm.*, 192 F.R.D. at 659 ("[W]hen determining which group has the largest financial interest courts may only look to the losses sustained by the class members actually being put forward by any particular group to act as lead plaintiffs.") As a consequence,

the only trades to be considered here are those asserted by CalPERS in its initial motion papers.

Having disposed of both CalPERS' and Sea Carriers' purportedly increased financial interests in a manner that leaves the initial assessments unaffected, CalPERS is deemed to have the largest financial interest in large block transactions and Empire is deemed to have the largest financial interest in market orders placed over SuperDOT.

### 2. CalPERS and Empire Preliminarily Satisfy the Relevant Requirements of Rule 23

■ Once the court " 'identifies the plaintiff with the largest stake in the litigation, further inquiry must focus on that plaintiff alone and be limited to determining whether he satisfies the other statutory requirements.' " *Sofran*, 220 F.R.D. at 402 (quoting *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir.2002) (observing that the district court's belief that "another plaintiff may be 'more typical' or 'more adequate' is of no consequence. So long as the plaintiff with the largest losses satisfies the typicality and adequacy requirements, he is entitled to lead plaintiff status, even if the district court is convinced that some other plaintiff would do a better job.")); *see also Cendant II*, 264 F.3d at 262 ("Once the court has identified the movant with 'the largest financial interest in the relief sought by the class,' it should then turn to the question whether that movant 'otherwise· satisfies the requirements of

---

**25.** No explanation is given as to why the trades executed by Market Street are not included in this aggregation.

**26.** *CalPERS is careful not to assert an interest in* Generic Trading's trades directly, but instead argues that it has "documented" a "massive financial interest" as the result of its alliance. (Joint Opp. Mem. at 16.) The documentation of other class members' financial interests is irrelevant to the determination of CalPERS' own financial interest in the relief sought here. *See, e.g., In re Baan Co. Sec. Litig.*, 186 F.R.D. 214, 217 (D.D.C. 1999) (explaining that the financial interest of a 466–member plaintiff group is not relevant where only a 20–member sub-group is proposed as lead plaintiff, and noting that plaintiffs, by asserting a financial interest on behalf of the larger group, "are playing a shell game with the statute").

**27.** In their joint opposition brief, Generic Trading and Market Street announce that, along with CalPERS, they "will, subject to Court approval, serve as class representatives." (Joint Opp. Mem. at 1.) As it is manifestly too early to consider class representation at this stage in the litigation, it is unclear what the import of the joint announcement may be, other than to lay bare the terms of the arrangement reached among CalPERS, Generic Trading, and Market Street that has permitted CalPERS to emerge as the sole remaining movant among the three.

**28.** While shares traded are acting as a placeholder for losses in the instant matter, the analogy still holds.

Rule 23 of the Federal Rules of Civil Procedure'...."); *Schulman,* 2003 WL 21415287, at *4–6 (commenting that the Second Circuit "has not ruled whether the requirements of the most adequate plaintiff presumption are to be applied serially in order, or whether each requirement is applied to the motion or complaint despite its inability to satisfy all of the presumption's requirements," but applying the requirements in sequence).

Rule 23(a) of the Federal Rules of Civil Procedure provides that a party may serve as a class representative only if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Of the four prerequisites to class certification, only two—typicality and adequacy—directly address the personal characteristics of the class representative. Consequently, in deciding a motion to serve as lead plaintiff, "[t]he moving plaintiff must make only a preliminary showing that the adequacy and typicality requirements under Rule 23 have been met." *Weinberg,* 216 F.R.D. at 252 (citing *In re Crayfish,* 2002 WL 1268013, at *4; *Weltz,* 199 F.R.D. at 133). "In fact, a 'wide ranging analysis under Rule 23 is not appropriate [at this initial stage of the litigation] and should be left for consideration of a motion for class certification.'" *Weinberg,* 216 F.R.D. at 252 (quoting *In re Party City Sec. Litig.,* 189 F.R.D. 91, 106 (D.N.J.1999)).

### a. Typicality

■ Typicality exists if claims "arise from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992), *cert. dismissed sub nom. Hart Holding Co. Inc. v. Drexel Burnham Lambert Group, Inc.,* 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993). The claims of class representatives need not be identical to the claims of the class to satisfy the typicality requirement. In that regard, courts have recognized that "[t]he possibility of factual distinctions between the claims of the named plaintiffs and those of other class members does not destroy typicality, as similarity of legal theory may control even in the face of differences of fact." *In re Prudential Sec., Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 208 (S.D.N.Y.1995).

Both CalPERS and Empire executed stock trades on the NYSE during the proposed class period at prices alleged to have been affected by the purported conduct of Defendants, and both allege that they have suffered damages as a consequence. CalPERS and Empire's claims and the claims of other class members therefore arise out of the same course of events. *See Walsh v. Northrop Grumman Corp.,* 162 F.R.D. 440, 445 (E.D.N.Y.1995) (holding that the typicality requirement is satisfied if a movant's claims arise "'from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory'") (quoting *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981)).

Both CalPERS and Empire also make legal arguments that are similar to those made in the other complaints filed to date. That CalPERS has raised several theories of liability and recovery not present in Empire's complaint and named defendants, including the NYSE, not named by Empire does not diminish the similarity between Empire's legal arguments and those of other class members, since "[t]he claims of the proposed lead plaintiff need not be identical to the claims alleged by other class members." *Fitzgerald v. Citigroup, Inc.,* No. 03 Civ. 4305(DAB), 2004 WL 613107, at *3 (S.D.N.Y. Mar. 26, 2004) (citing *In re Party City,* 189 F.R.D. at 107).

### b. Adequacy

■ Under Rule 23(a)(4), the representative party must also "fairly and adequately protect the interests of the class." In order to satisfy the adequacy requirement of Rule 23(a),

(1) there should be no conflict between the interests of the class and the named plaintiff nor should there be collusion among the litigants; and (2) the parties' attorney must be qualified, experienced, and generally able to conduct the proposed litigation. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. MDL 1500, 2003 WL 102806, at *2 (S.D.N.Y. Jan. 10, 2003) (quoting *Jackson v. Foley*, 156 F.R.D. 538, 543 (E.D.N.Y.1994)). In addition, the lead plaintiff should have a "sufficient interest in the outcome to ensure vigorous advocacy." *Fitzgerald*, 2004 WL 613107, at *4 (citing *In re Olsten*, 3 F.Supp.2d at 296).

CalPERS and Empire have alleged significant injury and each has filed both a complaint and a motion to be appointed lead plaintiff, demonstrating an interest in the outcome of the litigation. As discussed *infra*, both CalPERS and Empire have retained competent counsel. There is also no indication in the papers submitted on this motion by CalPERS or Empire that either has interests antagonistic to those of the proposed class.

In light of the foregoing, both CalPERS and Empire are entitled to the most adequate plaintiff presumption.

### C. The Presumption in CalPERS' and Empire's Favor Is Not Rebutted and a Co–Lead Plaintiff Structure Is Appropriate

In the final step of the appointment process, the competing movants are given the opportunity to rebut the presumption that CalPERS and Empire are the most adequate plaintiffs. "[T]his presumption may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff ... will not fairly and adequately protect the interests of the class; or ... is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Metro Services*, 158 F.3d at 164 (quoting 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)).

### 1. The Presumption in Favor of Cal-PERS Is Not Rebutted

The presumption of CalPERS' adequacy has not been rebutted. First, for the reasons set forth above, the fact that CalPERS' certification does not specify which of CalPERS' purported 2.83 billion shares in NYSE-listed stock transacted during the proposed class period were actually traded on the NYSE as opposed to other venues does not render CalPERS inadequate at this stage. Although CalPERS' assertion that it engaged in both market order and limit order transactions over SuperDOT, announced in a filing submitted after oral argument, is somewhat surprising in view of CalPERS' previous depictions of the limited relevance of trades placed via SuperDOT, neither the timing of the announcement nor its substance constitutes proof of CalPERS' inadequacy. Nor do CalPERS' earlier arguments minimizing the relevance of claims related to transactions placed over SuperDOT render CalPERS inadequate to represent the interests of a class that includes SuperDOT traders, as Sea Carriers suggests, particularly in view of the co-lead plaintiff structure set forth here, which pairs CalPERS with Empire, a SuperDOT trader.

Sea Carriers also argues that CalPERS' counsel, which was simultaneously retained by both CalPERS and Generic Trading for a portion of the proceedings to date, ran afoul of certain applicable ethical rules by this simultaneous representation and is therefore not adequate. CalPERS, although not denying the brief concurrent representation, notes that its counsel has withdrawn as counsel to Generic Trading and argues that whatever issue may have been raised by the earlier representation has been eliminated. As the concurrent representation is not ongoing, no issue is presented here. *See generally In re Joint E. & S. Dist. Asbestos Litig.*, 133 F.R.D. 425, 429 (E.D.N.Y.1990) (" 'A lawyer shall not *continue* multiple employment if the exercise of independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests.' ") (quoting *ABA Model Code of Prof'l Responsibility* DR 5–105 (1980)) (emphasis supplied).

■ Finally, Sea Carriers claims that CalPERS has significant conflicts of interest which raise "serious questions about whether it properly can or should represent the Class." (Sea Carriers Opp. Mem. at 13.) Specifically, Sea Carriers argues that Cal-PERS is a "major shareholder in the parent companies of four of the top five defendant specialist firms, including three which it actually directs," and that, as a consequence, it is conflicted. (*Id.*)

The proposition that "a lead plaintiff who retains a substantial investment in a defendant corporation cannot adequately represent a class in a lawsuit against that corporation because this lead plaintiff will naturally be conflicted between trying to get maximum recovery for the class and trying to protect its ongoing investment in the corporation" is, as the Third Circuit Court of Appeals has aptly noted, an "attractive" one. *Cendant II*, 264 F.3d at 243. Nonetheless, as the *Cendant* court concluded, Congress appears to have rejected this thesis, at least in the abstract, in enacting the PSLRA's lead plaintiff provisions by anticipating and intending that large institutional investors would serve as lead plaintiffs. *See id.* at 243–44 (noting that Congress was presumably "aware that an institutional investor with enormous stakes in a company is highly unlikely to divest all of its holdings in that company, even after a securities class action is filed in which it is a class member" and suggesting that, therefore, Congress must have concluded that such a situation "does not inherently create an unacceptable conflict of interest") (citing Senate Report at 690 ("The Committee believes that an institutional investor acting as

lead plaintiff can, consistent with its fiduciary obligations, balance the interests of the class with the long-term interests of the company and its public investors.")).[29]

### 2. The Presumption in Favor of Empire Is Not Rebutted

Sea Carriers raises little opposition to Empire's candidacy apart from its allegations concerning the ownership of a portion of the losses asserted by Empire, allegations which, as presented by Sea Carriers, go to the magnitude of Empire's financial interest and are thus not relevant to rebutting the presumption that Empire is the most adequate plaintiff.[30] CalPERS, however, has raised a host of arguments to rebut Empire's presumptive adequacy.

First, CalPERS insinuates that Empire is not adequate as it is "purportedly represented by three separate law firms," each listed on Empire's complaint. (Joint Opp. Mem. at 8 (emphasis omitted).) CalPERS cites no precedent holding that such tripartite representation is improper or would subject Empire to unique defenses, particularly as Empire is only proposing a single law firm as lead counsel.

■ CalPERS next argues that Empire cannot meet the standards set forth in Fed. R.Civ.P. 23(a) insofar as it has failed to provide sufficient information about itself. The cases cited by CalPERS, however, do not support the notion that courts have required movants "to provide adequate information about themselves" in addition to and apart from the PSLRA's own requirements and that the failure to do so is, as CalPERS

---

**29.** This pronouncement does not suggest that an institutional investor's holdings in a defendant entity are irrelevant or that they may never be found to give rise to a conflict of interest. Where, for instance, a proposed lead plaintiff group has been shown to have a financial interest in a defendant several times greater than the group's alleged losses with respect to the underlying claim against that defendant, the group has been found to have a sufficient conflict of interest precluding its appointment as lead plaintiff with respect to that claim. *See In re Cendant Corp. Litig.*, 182 F.R.D. 144, 149 (D.N.J.1998) (*"Cendant I"*). Contrary to CalPERS' suggestion, *Cendant II* does not appear to overrule the more tailored conflict ruling of *Cendant I*. In any event, Sea Carriers, although relying on *Cendant I*, does

not establish that CalPERS' holdings significantly outweigh its alleged losses.

**30.** Sea Carriers claims that Empire, along with the other movants, has offered "no evidence whatsoever attempting to tie the alleged wrongdoing to any of their trades; and none indicate that they have any sort of data that could show that they were in fact damaged in any of their trades," as Sea Carriers alleges it can demonstrate. (Sea Carriers Opp. Mem. at 10.) As Sea Carriers notes elsewhere, however, courts do not require a movant for lead plaintiff to establish its damages at this stage. (*See* Letter of Marian P. Rosner to the Court, dated Feb. 9, 2004, at 1.)

asserts, "fatal" to Empire's application. (*Id.* at 9.) Rather, each of the cases cited suggests only that a comparative lack of information, when viewed in contrast with information provided by other movants, may be considered by the court in reaching its final determination as to a lead plaintiff appointment. *See Piven v. Sykes Enters., Inc.*, 137 F.Supp.2d 1295, 1305 (M.D.Fla.2000); *In re Conseco Inc. Sec. Litig.*, 120 F.Supp.2d 729, 732 (S.D.Ind.2000). Where, as here, a movant has filed a certification pursuant to 15 U.S.C. § 78u–4(a)(2)(A) providing certain basic information,[31] a failure to provide more detailed information does not, in and of itself, represent proof that the movant will not fairly and adequately protect the interest of the class.

Changing tack, CalPERS also suggests that the very information which Empire purportedly failed to provide rebuts the presumption in Empire's favor because it indicates that Empire is subject to unique defenses. Specifically, CalPERS contends that Empire "is a massive day-trading operation—using program trading to dart in and out of NYSE stocks in small trades, thousands of times a day" (Joint Opp. Mem. at 11 (emphasis omitted)), and that, as an in-and-out trading entity, Empire is subject to unique defenses. Even assuming, *arguendo*, that Empire is either a day-trading operation or an in-out trader, courts differ as to whether such entities may serve as a lead plaintiff in a standard securities fraud class action involving alleged fraud on the market. *Compare In re Royal Ahold N.V. Sec. & Erisa Litig.*, 219 F.R.D. 343, 354 (D.Md. 2003) (declining to find that, as a day trader that allegedly does not rely on "the financial statements or the fundamental value of a company as the rest of the market does," one member of a group moving for lead plaintiff status was atypical, since "where false information and misleading omissions pollute the market, all types of investors are injured") *and Welling v. Alexy*, 155 F.R.D. 654, 661–62 (N.D.Cal.1994) (surveying the case-law and concluding that a purported in-out trader may serve as a class representative), *with In re Bank One Shareholders Class Actions*, 96 F.Supp.2d 780, 784 (N.D.Ill.2000) (suggesting that, when compared to another group of institutional investors, an entity that "engaged in extensive daytrading" was not qualified to serve as lead plaintiff) *and In re McKesson HBOC, Inc. Sec. Litig.*, 97 F.Supp.2d 993, 998 (N.D.Cal.1999) (holding that it was "inappropriate to count losses (or profits) by 'in-and-out' traders in this case when determining the plaintiff with the greatest financial interest in the litigation"). In light of these varied holdings and of the lack of any specific showing as to why transactions by day-traders or in-and-out traders should be disregarded or discounted in an execution price fraud case such as this,[32] CalPERS' allegation does not suffice to establish that Empire is subject to a unique defense here.

Nor does CalPERS' suggestion that "it is far from clear that Empire . . . has suffered any real loss itself or has sufficiently distinguished any losses of its own from losses of its customers on NYSE trading activities" (Joint Opp. Mem. at 11) constitute proof that the presumptive lead plaintiff is subject to unique defenses that would render the plaintiff inadequate as a representative. CalPERS' insinuations that some sort of impropriety should be construed from the fact that Empire is not currently registered as a bro-

---

**31.** CalPERS contends that the certification signed by R. Allan Martin on behalf of Empire is not a sworn certification, and is thus insufficient. Challenges to the sufficiency of the certifications will not be entertained at this stage, *see supra* text accompanying notes 18–19, and particularly in light of the arguable shortcomings of each of the remaining movants' own certifications.

**32.** CalPERS argues simply, and without supporting evidence, that small trades routed over SuperDOT are accomplished "with minimal specialist intervention" and that such trades, "while not immune, are much less likely to suffer the type of specialist manipulation which is alleged to have damaged investors in this case." (Joint Opp. Mem. at 12–13.) Empire and Sea Carriers have both argued the contrary, and Empire suggests that, by asserting Empire's status as an in-and-out trader, "CalPERS demonstrates that Empire also has the largest business and financial interest in obtaining redress in this litigation . . . [since] Empire is dependent on small profit differentials to stay in business. Therefore, execution fraud has a proportionally greater and temporally more frequent enterprise-threatening effect on Empire." (Empire Reply Mem. at 6.)

ker-dealer with the National Association of Securities Dealers ("NASD") or with the New Jersey Bureau of Securities (*id.* at 10–11) are similarly wanting.

However, CalPERS' next assertion aimed at rebutting the presumption of Empire's adequacy has more teeth. CalPERS argues that the integrity of Robert A. Martin ("Martin"), Empire's principal, is "open to question" based on a 1992 fine assessed against Martin. (*Id.* at 12.) Specifically, based on information retrieved by a private investigator retained by CalPERS' counsel, it appears that Martin, pursuant to an offer of settlement, was censured and ordered to pay a total of $20,000, of which $5,000 was a fine, for violations of the rules of the Chicago Mercantile Exchange ("CME"). (Affidavit of Lynne R. Hodges, dated Jan. 5, 2004 ("Hodges Aff."), ¶ 5.) The violations in question purportedly involved telephone calls placed by Martin to officials of the National Pork Producers Council on two occasions during which Martin is said to have attempted to influence the release of market information by misrepresenting himself as a government official. (*Id.*)

While not denying CalPERS' description of the 1992 censure, Empire counters the allegations by stating that Martin has considerable experience acting as a fiduciary through his role as a broker from 1987 until 2003, during which time no customer complaints were lodged against him, and his service as a trustee for a charitable trust. According to Empire, these facts establish that Empire, through Martin, is capable of acting as a fiduciary on behalf of a class.

 CalPERS is correct that honesty and trustworthiness are relevant factors in assessing a candidate's ability to serve as an adequate fiduciary for a class, *see Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir.1998) (considering adequacy in the class certification context); *see also Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir.1983), and that the violations claimed may raise questions with regard to Martin's ability to so serve. Nonetheless, CalPERS' account suggests only that the censure was issued as the consequence of a settlement and that the "findings" that Martin's conduct was in violation of the CME rules were expressly reached "[p]ursuant to an offer of settlement in which … Martin neither nor admitted nor denied violating CME rules." (Hodges Aff., ¶ 5.) CalPERS does not demonstrate that any of the underlying wrongdoing was actually proven or otherwise established on the record.[33] Accordingly, and in view of the preliminary nature of these proceedings, it is not appropriate to reject Empire's candidacy on this basis.

---

**33.** *Compare In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 682–83 (N.D.Cal.1986) (concluding that a plaintiff was adequate despite his indictment by a federal grand jury on charges of mail fraud and racketeering and a number of civil suits having been brought against him, since he was never found guilty of actual wrong-doing, the indictment was dismissed, the suits were either settled or dismissed, and "the only improper conduct actually documented by the defendants relates to four Christmas gifts made approximately ten years ago") *and Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 696–97 (N.D.Ga.1983) (rejecting arguments that a federal investigation into a candidate's failure to report a prior bankruptcy on a loan application demonstrates the candidate's inadequacy to serve as class representative, as "[t]he record is not conclusive that [the candidate's] omission was deliberately dishonest or in bad faith") *with In re Proxima Corp. Sec. Litig.*, No. 93–1139–IEG(LSP), 1994 WL 374306, at *17 (S.D.Cal. May 3, 1994) (concluding that a plaintiff that admitted to engaging in a fraud was unfit to serve as a class representative, since the "admission of wrongdoing here distinguishes this case from those cases in which the courts typically certify class representatives in the face of mere allegations of misconduct or unlawful activity"); *Kornick v. Talley*, 86 F.R.D. 715, 721 (N.D.Ga. 1980) (rejecting trustees as candidates for class representative when they had admitted loaning funds to themselves from the trust, thereby breaching their fiduciary duties, although these activities had not been the subject of any lawsuit); *and Folding Cartons, Inc. v. American Can Co.*, 79 F.R.D. 698, 703 (N.D.Ill.1978) (stating that findings in a previous action that plaintiff's principal had participated in deceptive selling schemes and had deliberately lied and concealed his actions were "persuasive evidence of the inadequacy of the named plaintiff to assume the fiduciary position of a class representative"). *But cf. In re Network Assocs., Inc. Sec. Litig.*, 76 F.Supp.2d 1017, 1029 (N.D.Cal.1999) (concluding that an entity was not adequate to serve as lead plaintiff due, in part, to the fact that two of its sister entities were under investigation for criminal fraud violations in a foreign jurisdiction, as a result of which the court was "unwilling to install an enterprise under such a cloud in a position of trust and confidence").

Moreover, even if the violations in question had been proven, they do not appear to represent the degree of serious misconduct that would require Empire's candidacy to be rejected at this stage,[34] particularly in view of their vintage, *see, e.g., In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 683 (N.D.Cal.1986), and in the absence of any specific connection between the types of violations claimed and the execution fraud alleged here. *See Zemel Family Trust v. Philips Int'l Realty Corp.*, 205 F.R.D. 434, 436 (S.D.N.Y.2002) (concluding that plaintiff trust's trustee was not qualified to serve as a class representative in a securities fraud action where he had been significantly involved with activities that were the subject of SEC cease and desist orders and where the subject of the orders "calls to mind the nature of the very claim that plaintiff alleges in this case"); *Weisman v. Darneille*, 78 F.R.D. 669, 670–71 (S.D.N.Y.1978) (rejecting a plaintiff's candidacy for class representative where plaintiff was a felon convicted of the very securities statute he invoked in the lawsuit); *Amswiss Int'l Corp. v. Heublein, Inc.*, 69 F.R.D. 663, 669–71 (N.D.Ga.1975) (rejecting proposed class representatives who had been convicted of federal securities violations and had specifically been found not to be credible witnesses).

■ Finally, CalPERS argues that Empire is not equipped to serve as a lead plaintiff in this complex and novel securities class action. Empire, according to CalPERS, operates out of Martin's own home and is a "family enterprise," with five total employees, including Martin and his son. (Joint Opp. Mem. at 9–10.) Furthermore, CalPERS notes that Empire "does not have the kind of sophisticated in-house legal department that CalPERS has and that is necessary to adequately oversee and control the prosecution of a case like this one." (*Id.* at

10.) Accordingly, CalPERS argues, Empire does not have the resources to oversee and control the prosecution of this consolidated action adequately.

In enacting the PSLRA, Congress expressed an intention to encourage institutional investors to step forward and assume the role of lead plaintiff in an effort to prevent lawyer-driven litigation. *See Sofran*, 220 F.R.D. at 404 (citing House Report at 679); *In re Oxford Health Plans*, 182 F.R.D. at 46 (same). Some courts have understood this intention to favor large institutional investors, whose resources and experience will be of significant assistance to the prosecution of the action. *See, e.g., Cendant II*, 264 F.3d at 243–44 ("The plaintiff with the largest stake in a given securities class action will almost invariably be a large institutional investor, and the PSLRA's legislative history expressly states that Congress anticipated and intended that such investors would serve as lead plaintiffs."); *Gluck v. CellStar Corp.*, 976 F.Supp. 542, 548 (N.D.Tex.1997) ("[T]hrough the PSLRA, Congress has unequivocally expressed its preference for securities fraud litigation to be directed by large institutional investors."); *cf. In re Royal Ahold*, 219 F.R.D. at 354 (finding that two candidates for lead plaintiff "are both large, sophisticated institutional investors as contemplated by the PSLRA to prosecute securities fraud actions" but determining them to be subject to unique defenses).

■ While the size, available resources or even experience of a candidate are not dispositive factors in appointing a lead plaintiff, they are nonetheless relevant to reaching a determination as to whether a candidate will be capable of adequately protecting the interests of the class. *See In re Gemstar–TV Guide Int'l, Inc. Sec. Litig.*, 209 F.R.D. 447, 455 (C.D.Cal.2002) ("[T]he fact that two insti-

---

34. At least one court has declined to permit an individual to remain a member of a group subsequently appointed lead plaintiff, where the individual had previously been cited for serious violations of SEC and NASD rules on two separate occasions. *See Newman v. Eagle Bldg. Techs.*, 209 F.R.D. 499, 504–05 (S.D.Fla.2002). In ruling that the individual in question was inadequate to serve as a member of a lead plaintiff group, the *Newman* court reached its conclusion based in large part on the fact that one of the citations, "in particular, was not a minor slap on the wrist," as it led to the revocation of the individual's supervisory license, "a major punishment." *Id.* at 504. No such suspension or similarly serious action appears to have occurred with regard to Martin, who was ordered to pay a financial penalty and directed to write a letter of apology.

tutional investors—whose representatives [often in-house counsel] possess PSLRA experience—would supervise a single law firm suggests that the pension funds, rather than [the lead counsel], would control this litigation."); *In re Critical Path*, 156 F.Supp.2d at 1109 ("[W]hile it may be true that losing a high percentage of one's net worth due to an alleged fraud contributes to one's desire to prosecute a lawsuit against the wrongdoer, that desire is no substitute for the experience and resources of an institutional investor with, presumably, an in-house legal team and experience in the securities business.").

Here, it is undisputed that Empire has neither an in-house legal department nor any experience acting as a lead plaintiff in a securities class action. Although neither of these factors suffices to rebut the presumption of Empire's adequacy, they suggest that, under the circumstances presented here in a case of execution price fraud, adopting a structure by which CalPERS and Empire will serve as co-lead plaintiffs will best serve the interests of the proposed class, both so as to ensure that adequate resources and experience are available and for additional reasons set forth below.

### 3. A Co–Lead Plaintiff Structure Is Appropriate

■ Federal courts have reached varying conclusions concerning the propriety of appointing co-lead plaintiffs or multiple lead plaintiffs under the PSLRA.[35] Some courts have refused to appoint co-lead plaintiffs on the grounds that the PSLRA envisioned the appointment of only a sole lead plaintiff (even if that lead plaintiff comprises multiple plaintiffs who moved jointly for lead

plaintiff designation), or on the basis that the appointment of multiple lead plaintiffs would undermine the PSLRA's aims. *See, e.g., In re Enron Corp.*, 206 F.R.D. at 451 (refusing to appoint co-lead plaintiffs as "appointing multiple Lead Plaintiffs to represent specialized interests, especially in light of the common facts and legal issues here, would undermine the purpose of the PSLRA"); *Aronson v. McKesson HBOC, Inc.*, 79 F.Supp.2d 1146, 1154 (N.D.Cal.1999) (declining to appoint more than one lead plaintiff and adopting a narrow construction of the PSLRA that forecloses the possibility of appointing multiple plaintiffs or plaintiff groups as co-lead plaintiffs on the grounds that designating co-lead plaintiffs "would simply effect an end-run around the Reform Act. Indeed, whatever the evils of agglomerated 'group' plaintiffs, they theoretically demonstrated their ability to speak with one voice when they combined to work with one lawyer. (This, of course, assumes that the members of the group themselves initiated the representation, rather than the other way around.)"); *In re Donnkenny*, 171 F.R.D. at 157–58 (refusing to appoint two competing movant groups as co-lead plaintiffs, despite their stipulation providing for such appointment, on the grounds that permitting the aggregation of the unrelated groups "would allow and encourage lawyers to direct the litigation" contrary to the goal of the PSLRA and that "[c]ounsel have not offered any reason for appointing an aggregation of unrelated institutional and individual investors as lead plaintiffs other than the argument that the language of the statute does not expressly forbid such a result").[36]

**35.** The decision to appoint co-lead plaintiffs or multiple lead plaintiffs addressed here is at least nominally distinct from the debate regarding whether a group of plaintiffs that has moved together seeking appointment as lead plaintiff may properly be designated as such. Notably, the debate regarding the aggregation of various plaintiffs to form groups that subsequently move for appointment tends to implicate the PSLRA's express concern about lawyers directing litigation in ways that the court's discretionary appointment of multiple lead plaintiffs does not.

**36.** *See also Cendant II*, 264 F.3d at 223 n. 3 (declining to adopt the district court's appella-

tion of "co-lead plaintiffs" in its own discussion and agreeing with the SEC that "[t]here is *one* lead plaintiff under the Reform Act: an individual, an institution or a properly-constituted group") (quotation marks and citation omitted); *In re Network Assocs., Inc. Sec. Litig.*, 76 F.Supp.2d 1017, 1025 (N.D.Cal.1999) (approvingly quoting at length the SEC's position that under the PSLRA "there can only be one lead plaintiff, [although] that plaintiff need not be a single person or entity, but rather might be a group of persons who have joined forces" and that reading the statutory language "to allow the appointment of competing movants as co-lead plaintiffs would appear inconsistent with the lan-

Other courts have determined that the interests of a proposed class will be served best by the appointment of co-lead plaintiffs or multiple lead plaintiffs who did not move initially as a group. *See, e.g., In re Cable & Wireless,* 217 F.R.D. at 376 (concluding that the presumptively most adequate plaintiff, an individual investor, was not "particularly ... ideal" and deciding to appoint an institutional investor—and competing movant—as co-lead plaintiff in furtherance of the PSLRA's goal to involve institutional investors in securities class actions); *Miller v. Ventro Corp.,* No. 01 Civ. 1287, 2001 WL 34497752, at *11–12 (N.D.Cal. Nov. 28, 2001) (appointing as co-lead plaintiffs separate movants in order to ensure that the distinct classes proposed in various consolidated actions involving both bondholders and stockholders were adequately represented); *In re Lucent Techs., Inc. Sec. Litig.,* 221 F.Supp.2d 472, 483, 488 (D.N.J.2001) (having consolidated a new wave of complaints with a series of previous actions for which a lead plaintiff had already been appointed, concluding that, in light of the different claims raised over varying periods of time, appointing a co-lead plaintiff would provide "additional representation [that] may benefit the class and provide flexibility, if needed, in the future" and that appointment of the co-lead plaintiff in question was "consistent with the purpose of the PSLRA" to increase the involvement of institutional investors); *Laborers Local 1298 Pension Fund v. Campbell Soup Co.,* No. 00 Civ. 152(JEI), 2000 WL 486956, at *3 (D.N.J. Apr. 24, 2000) (appointing two competing movants as co-lead plaintiffs in view of the desirability of having both institutional investors and individual investors as lead plaintiffs "since each may bring a unique perspective to the litigation"); *Burke v. Ruttenberg,* 102 F.Supp.2d 1280, 1342–43 (N.D.Ala.2000) (noting that "for a group or committee of investors to be appointed lead plaintiff, the benefits inuring to the class from aggregation for

the addition of each new group member must outweigh any concurrent loss in control over lead plaintiff's counsel" and appointing as lead plaintiff a committee composed of certain competing movants on the grounds that the inclusion of each member of the committee "shores up holes in the representation" of the proposed class and "does not appear likely to result in a significant loss of control by plaintiffs over the litigation"); *In re Oxford Health Plans,* 182 F.R.D. at 45 (appointing three competing movants as co-lead plaintiffs on the grounds that such a structure "provides the proposed class with the substantial benefits of joint decision-making and joint funding and is consistent with the language of the PSLRA and the purpose of Congress in enacting it").

Still other courts have suggested their possible amenability to the appointment of co-lead plaintiffs, declining to appoint co-lead plaintiffs not on the basis of any hard-line prohibition but instead on the grounds that the need for or benefit of such a structure had not been established in the circumstances of the particular case. *See, e.g., In re Cree, Inc., Sec. Litig.,* 219 F.R.D. 369, 372 (M.D.N.C.2003) ("Plaintiffs have not identified, nor has the court determined, any reason why co-lead plaintiffs would be helpful or appropriate or why the presumptive lead plaintiff alone should not be appointed.... Plaintiffs have done nothing to show that joint lead plaintiffs are necessary or beneficial to the class."); *Janovici v. DVI, Inc.,* Nos. 03 Civ. 4795(LD) *et al.,* 2003 WL 22849604, at *13 (E.D.Pa. Aug. 20, 2003) (finding that the interests of the class would not be enhanced by the appointment of two groups of plaintiffs as co-lead plaintiffs, particularly as the movant groups had not demonstrated the necessity or efficacy of such a structure); *EZRA Charitable Trust v. Rent–Way, Inc.,* 136 F.Supp.2d 435, 444 (W.D.Pa. 2001) (declining to appoint a competing

guage in the Act ... which looks toward appointment of a single lead plaintiff"); *cf. In re Nice Sys. Sec. Litig.,* 188 F.R.D. 206, 220 (D.N.J.1999) (appointing multiple members of a movant group as lead plaintiffs, but noting that "[w]here multiple lead plaintiffs have divergent interests, the leadership of a class may be divided, and rendered factious" and commenting that diverse

representation, as a basis for appointing co-lead plaintiffs, is "an insufficient rationale.... Focusing on considerations such as diverse representation and additional financing overlooks the fundamental goal of the PSLRA—the empowerment of a unified force to control the litigation.").

group of plaintiffs as co-lead plaintiffs where the group in question "ha[d] not established that its perspective as a small group of individual investors will materially add to the overall quality of lead representation in this case"); *see also In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 422 (S.D.N.Y.2003) ("While the PSLRA certainly envisions appointment of co-lead plaintiffs, there was no competitor or group of competitors for the position of lead plaintiff that presented any serious challenge on the merits to the application made by [the movant later named lead plaintiff] when measured by the standards that apply to selection of lead plaintiff.").

In light of the novel circumstances of these consolidated actions and the Court's acknowledged discretion in the lead plaintiff appointment process, a co-lead plaintiff structure is appropriate here. Such a structure, as noted above, will help to ensure that adequate resources and experience are available to the prospective class in the prosecution of this action. Employing a co-lead plaintiff structure here will also provide the proposed class with "the substantial benefits of joint decision-making," *In re Oxford Health Plans*, 182 F.R.D. at 45, a significant advantage if not outright imperative in this consolidated action, given the divergent views expressed in the movants' papers as to the subject of the litigation and what types of transactions were allegedly affected by Defendants' purported conduct. Particularly in light of the novelty of this type of action, it is anticipated that the different perspectives that CalPERS and Empire each brings "will materially add to the overall quality of lead representation in this case." *EZRA Charitable Trust*, 136

F.Supp.2d at 444. Furthermore, creating a co-lead structure here will have the salutary effect of providing greater stability in the prosecution of these consolidation actions, should a decision be reached at some later stage in the litigation that either co-lead plaintiff will not adequately represent the class or that the financial interest of one of the co-lead plaintiffs demonstrably eclipses that of the other co-lead plaintiff.

Based on the foregoing discussion, Empire and CalPERS will be appointed co-lead plaintiffs of the consolidated actions herein.

### III. Lerach Coughlin Stoia & Robbins LLP and Lovell Stewart Halebian, LLP Are Appointed Co–Lead Counsel

Pursuant to 15 U.S.C. § 78u–4(a)(3)(B)(v), the lead plaintiff shall, subject to the court's approval, select and retain counsel to represent the class. In that regard, CalPERS and Empire each initially selected and retained Milberg Weiss and Lovell Stewart Halebian, LLP ("LSH"), respectively, and thereafter proposed that each set of counsel serve as lead counsel for the class.[37] As set forth above, Milberg Weiss has since split into two separate law firms, and based on a representation in CalPERS' moving papers, CalPERS is now understood to be represented by Lerach Coughlin Stoia & Robbins LLP ("LCSR").[38]

Based on the materials submitted and notwithstanding the reduction in size of CalPERS' counsel, both CalPERS' counsel and Empire's counsel have extensive experience prosecuting complex actions, including securities or shareholder class actions, have re-

---

**37.** CalPERS subsequently announced that, in conjunction with the formation of a coalition with Generic Trading and Market Street in favor of CalPERS' designation as lead plaintiff, CalPERS was seeking approval of the Court "to designate its counsel, Milberg Weiss, and the Entwistle & Cappucci firm (counsel to Generic [Trading]), as co-lead counsel." (Joint Opp. Mem. at 20.) Coalitions among movants formed after the conclusion of the PSLRA's 60–day filing period, such as the alliance established here, raise a variety of concerns, not the least of which is the risk of manipulation of the lead plaintiff appointment process by movants or, more specifically, their counsel. *See Rozenboom v. Van Der Moolen Holding, N.V.*, No. 03 Civ. 8284(RWS), 2004 WL 816440, at *4–5 (S.D.N.Y. April 14,

2004) (describing various problems posed by *post facto* alliances). In view of these concerns, the circumstances in which CalPERS modified its proposal for lead counsel, the fact that Generic Trading is no longer seeking lead plaintiff status for itself, and the court's discretion to decline to appoint a lead counsel candidate proposed by a lead plaintiff, *see, e.g., In re Cree, Inc., Sec. Litig.*, 219 F.R.D. 369, 372 (M.D.N.C.2003) (citing *In re Lucent Techs., Inc. Sec. Litig.*, 221 F.Supp.2d 472, 488 (D.N.J.2001)), Generic Trading's counsel, Entwistle & Cappucci, will not be considered as a candidate for co-lead counsel.

**38.** *See supra* note 7.

peatedly served as lead counsel or co-lead counsel, and are well qualified to represent the proposed class. (*See* Dowd Aff., Ex. E; Gray Aff., Ex. 3.) Accordingly, CalPERS' and Empire's respective selections of LCSR and LSH will be approved, "provided that there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorneys' fees and expenses." *In re Donnkenny,* 171 F.R.D. at 158.

## IV. CalPERS' Motion for the Preservation of Evidence Is Denied

CalPERS has moved for an order directing the preservation of relevant documents and other evidence relating to this litigation in accordance with 15 U.S.C. § 78u–4(b)(3)(C)(i), both prior to and after the filing of any motion to dismiss. No opposition to this motion has been submitted.

■ Under the PSLRA preservation provision cited by CalPERS, "the preservation of evidence in the possession of the parties is statutorily automatic." *In re Grand Casinos, Inc. Sec. Litig.,* 988 F.Supp. 1270, 1273 (D.Minn.1997). The PSLRA preservation provision mandates that:

> During the pendency of any stay of discovery pursuant to this paragraph, unless otherwise ordered by the court, any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(b)(3)(C)(i). The provision was enacted "in recognition that 'the imposition of a stay of discovery may increase the likelihood that relevant evidence may be lost.'" *In re Grand Casinos,* 988 F.Supp. at 1271 (quoting Senate Report at 693); *see also Asset Value Fund Ltd. P'ship v. Find/SVP, Inc.,* No. 97 Civ. 3977(LAK), 1997 WL 588885, at *1 (S.D.N.Y. Sept. 19, 1997). The PSLRA provides for the possibility of court-ordered sanctions in response to a party's "willful failure" to comply with the duty to preserve relevant evidence. 15 U.S.C. § 78u–4(b)(3)(C)(ii).

CalPERS has not indicated that it is seeking the preservation of documents by non-parties, nor has it argued that Defendants lack notice as to which types of documents need be preserved. Accordingly, CalPERS' motion for an order "directing the preservation of relevant evidence to prevent the destruction of documents and other information pertinent to this litigation" (CalPERS Notice of Motion at 2) is denied, as such an order would either unnecessarily duplicate the obligations created under the PSLRA or, to the extent CalPERS seeks an order preventing the destruction of "other information pertinent to this litigation" (*id.*), alter those obligations without justification. *See Schnall v. Annuity & Life Re (Holdings) Ltd.,* Nos. 302 Civ. 2133(GLG), 303 Civ. 1826(GLG), 2004 WL 51117, at *2 (D.Conn. Jan. 2, 2004) (denying a request for a preservation order) (citing *In re Tyco Int'l, Ltd. Sec. Litig.,* No. 00 MD 1335, 2000 WL 33654141, at *2 (D.N.H. July 27, 2000)); *In re Grand Casinos,* 988 F.Supp. at 1273 (same).

## V. Conclusion

For the reasons stated above, the above-captioned cases are consolidated under the caption *In re NYSE Specialists Securities Litigation,* and the files of these consolidated actions shall be maintained in one file under Master File No. 03 Civ. 8264(RWS). The consolidation is for all purposes, including, but not limited to, discovery, pretrial proceedings and trial proceedings.

The motions of CalPERS and Empire to be appointed lead plaintiff are granted and they are hereby appointed Co–Lead Plaintiffs. The motion of Sea Carriers to be appointed lead plaintiff is denied. The respective counsel of CalPERS and Empire, Lerach Coughlin Stoia & Robbins LLP and Lovell Stewart Halebian, LLP, are appointed Co–Lead Counsel.

CalPERS' motion for an order directing the preservation of relevant documents and other evidence both prior to and after the filing of any motion to dismiss is denied.

Unless otherwise agreed among the parties, Co–Lead Plaintiffs shall file an amended consolidated class action complaint on or before 45 days from the date of entry of this order and opinion. Defendants shall submit any answer or defense thereto on or before 45 days after the filing of the amended consolidated class action complaint.

It is so ordered.