BULSARA, United States Magistrate Judge:
This is a putative consolidated class action brought on behalf of investors who purchased publicly traded securities of Sequans Communications S.A. ("Sequans") from April 29, 2016 through July 31, 2017. Plaintiffs Andrew Renner ("Renner") and Kevin Shillito ("Shillito") have brought claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 against Sequans and Georges Karam ("Karam"), Sequans's Chief Executive Officer, President, and Chairman of its Board of Directors; and Deborah Choate ("Choate"), Sequans's Chief Financial Officer. (Dkt. No. 1, Renner Compl. ¶¶ 1, 7-10).[1] The two separate actions brought by Renner and Shillito were consolidated on September 29, 2017. Sequans develops 4G semiconductor solutions for wireless broadband applications and is traded on the New York Stock Exchange under the ticker symbol "SQNS."
Pending before the Court are the competing motions for appointment as Lead Plaintiffs.[2] For the reasons stated below, the motion of Kulwant Johal and Matthew McGee (together "Johal and McGee") for appointment as Lead Plaintiffs, and for Pomerantz LLP and The Rosen Law Firm P.A. (together "Pomerantz and Rosen") for appointment as Co-Lead Class Counsel for the class, is granted. The motion of Jerry L. Searing ("Searing") to be appointed Lead Plaintiff, and for Glancy Prongay & Murray LLP ("GPM") to be appointed Lead Class Counsel for the class is denied. The motion of The Boca Raton Police and Firefighters' Retirement System ("Retirement System") to be appointed Lead Plaintiff, and for Berman Tabacco ("Berman") to be appointed Lead Class Counsel, is denied.
Background
Renner filed his Complaint on August 9, 2017. One day later, Shillito filed a virtually identical complaint. (2:17-CV-4707, Dkt. No. 1). The Honorable Frederic Block consolidated *419 both actions on September 29, 2017. (Dkt. No. 8).
The Renner Complaint alleges that on April 29, 2016, Sequans filed a Form 20-F for the fiscal year ending December 31, 2015 with the United States Securities and Exchange Commission ("SEC"), containing false financial results for the company. (Renner Compl. ¶ 15). The 20-F was signed by Karam, and contained certifications from both Karam and Choate, as required by the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of, among other things, the company's financial reporting, internal controls, and revenue recognition. (Id. ¶¶ 15-16). Another Form 20-F was filed by the company with the SEC on March 31, 2017 for the fiscal year ending December 31, 2016. (Id. ¶ 17). That Form 20-F also contained SOX certifications from Karam and Choate attesting to the accuracy of various statements contained therein, including about the company's revenue recognition. (Id. ¶¶ 17-18). Renner alleges that various statements in the Forms were materially false and misleading because, among other things, they failed to disclose that the company was improperly recognizing revenue. (Id. ¶¶ 19-23).
The Shillito Complaint contains nearly identical allegations. Filed against the same Defendants-Sequans, Karam, and Choate-it also alleges that on April 29, 2016, Sequans filed an annual Form 20-F for the fiscal year ending December 31, 2015, containing false financial results. (Shillito Compl. ¶ 22). Form 20-F was signed by Karam, and included necessary SOX certifications. (Id. ). Sequans filed a second 20-F on March 31, 2017, for the operating results of fiscal year ending December 31, 2016. (Id. ¶ 24). The second 20-F was again signed by Karam, and included SOX certifications attesting to the accuracy of the statements provided. (Id. ). The Shillito Complaint alleges that Sequans's statements in its 20-F submissions were materially false and misleading because "the Company was improperly recognizing revenue." (Id. ¶ 26).
The Renner Complaint contains two causes of action: (1) alleging a violation of Section 10(b) of the Exchange Act and Rule 10b-5, (Renner Compl. ¶¶ 34-43); and (2) alleging a violation of Section 20(a) of the Exchange Act, (id. ¶¶ 44-49). The Shillito Complaint contains the same two causes of action, alleging a violation of Section 10(b) of the Exchange Act and Rule 10b-5, (Shillito Compl. ¶¶ 41-50); and (2) alleging a violation of Section 20(a) of the Exchange Act, (id. ¶¶ 51-56). Both Complaints contain the same class periods of April 29, 2016 to July 31, 2017. (Renner Compl. ¶ 1; Shillito Compl. ¶ 1).
On October 10, 2017, three motions, each of which asked the Court to appoint the movant(s) as Lead Plaintiff, and designate lead counsel, were filed. The three Movants are: (1) Johal and McGee, (see Dkt. Nos. 9-11, 23-24, 32); (2) Searing, (see Dkt. Nos. 12-14); and (3) Retirement System, (see Dkt. Nos. 15-17, 19-21, 25, 34). After the motions were filed, Searing filed a "Notice of Non-Opposition" in which he indicated that he does not oppose the appointment of Johal and McGee as Lead Plaintiffs or to their choice of counsel. (Dkt. No. 18 at 1).
The Honorable Frederic Block asked this Court to decide the motions. (See Nov. 29, 2017 Minute Order).
Discussion
The Private Securities Litigation Reform Act ("PSLRA") requires that a plaintiff who files a complaint publish, in a widely circulated business oriented publication or wire service, a notice advising members of the purported class of "the pendency of the action, the claims asserted therein, and the purported class period"; and permits "not later than 60 days after *420 the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff[.]" 15 U.S.C. § 78u-4(a)(3)(A).
On August 9, 2017, counsel for Renner, from the Rosen Firm, caused a notice about the pendency of the action to be published in Business Wire . (See Declaration of Jeremy A. Lieberman dated October 17, 2017, Ex. A ("Lieberman Decl.") ). Business Wire "is a suitable vehicle for meeting the statutory requirement that notice be published." Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. LaBranche & Co. , 229 F.R.D. 395, 403 (S.D.N.Y. 2004). None of the moving parties have challenged the adequacy of the notice.
The 60-day period in which any member of the proposed class may apply for lead plaintiff status elapsed on October 10, 2017,[3] and each of the motions were timely. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).
I. Lead Plaintiff
The PSLRA requires the Court to appoint as "lead plaintiff" the member of the class that the Court determines to be "most adequate plaintiff," i.e. the member the court determines to be "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The Court must "adopt a presumption that the most adequate plaintiff" "is the person or group of persons" that:
(1) "has either filed the complaint or made a [timely] motion" to be appointed as lead plaintiff(s);
(2) "in the determination of the court, has the largest financial interest in the relief sought by the class"; and
(3) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure."
15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). This presumption may be rebutted "only" by proof that the presumptively adequate plaintiff either "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).
None of the Movants filed either the Renner or the Shillito complaint, but each made a timely motion to be appointed as lead plaintiff. The Court therefore turns to the two remaining elements of the presumption.
A. Largest Financial Interest
In assessing the financial interests of parties competing for lead plaintiff status, the Court will generally consider "(1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered." In re Gentiva Sec. Litig ., 281 F.R.D. 108, 112 (E.D.N.Y. 2012) (referring to factors as the " Olsten Factors," citing In re Olsten Corp. Sec. Litig ., 3 F.Supp.2d 286, 295 (E.D.N.Y. 1998) ). The fourth factor, the approximate losses suffered, is considered to be the most important. See *421 Baughman v. Pall Corp. , 250 F.R.D. 121, 125 (E.D.N.Y. 2008) ; see also Khunt v. Alibaba Grp. Holding Ltd. , 102 F.Supp.3d 523, 530 (S.D.N.Y. 2015).
Under these criteria Johal and McGee have the largest financial interest. During the class period, they collectively suffered approximately $144,271 in losses, based on a total purchase of 193,695 shares of Sequans, costing $721,574, and while retaining 190,945 shares. (See Lieberman Decl., Ex. C). The net funds expended during the class period were $712,608.[4] (See id. ). The net shares purchased during the class period were 190,945.[5] (Id. ). In contrast, Searing suffered $1209 in losses, based upon a purchase of 1000 shares, all of which he retained, costing $4186. (Declaration of Lesley F. Portnoy dated October 10, 2017, Ex. C ("Portnoy Decl.") ). And Retirement System suffered losses of $45,948, based on the purchase of 38,900 shares, all of which it retained, costing $161,734. (See Declaration of Jay Eng dated October 10, 2017, Ex. C). On each measure-losses suffered; total shares purchased; net shares purchased; and net funds expended-Johal and McGee's expenditures or losses is greater than the other two Movants. As a result, the Court concludes they have the largest financial interest.[6]
Retirement System argues that its losses are comparable to those of Johal (whose claimed loss standing alone is $108,303) and greater than McGee's individually ($35,968), and given the PLSRA's alleged preference for institutional investors serving as lead plaintiffs, the financial interest element of the presumption test favors Retirement System, not Johal and McGee. Even disaggregating Johal and McGee's losses, Johal's losses are more than double those of Retirement System. This is a far larger discrepancy than in those cases cited by Retirement System, (see Dkt. No. 19, Retirement System's Response in Opposition ("Ret. Sys. Br.") at 6-8). E.g. , Randall v. Fifth St. Fin. Corp. , No. 15-CV-7759, 2016 WL 462479, at *2 (S.D.N.Y. Feb. 1, 2016) (competing putative lead plaintiffs' losses were as close as $20,000 under one calculation, and depending on methodology, different plaintiffs had largest calculated loss); Juliar v. Sunopta Inc. , No. 08-CV-1070, 2009 WL 1955237, at *2 (S.D.N.Y. Jan. 30, 2009) ($30,000 differential).
The raw differential can be misleading; a difference of $5000 in losses may be significant where two competing movants suffered losses of say, $500 and $5500. It is less significant where there two movants have suffered losses of say, $350,000 and $355,000. The difference in magnitude does to some degree help put the losses in a larger context.[7] None of the cases cited by *422 Retirement System involve a court ignoring the result compelled by the PLSRA, in the face of losses that are twice that of the next potential lead plaintiff. Even if that were not the case, there are three other Olsten factors in evaluating financial interest, and each of those factors also favor Johal and McGee, see supra , and Johal individually as well. For example, Johal spent $602,956 acquiring his Sequans shares, of which he retained 165,900 shares, which is more than four times the shares held by Retirement Systems. (See Lieberman Decl., Ex. C). Consequently, the Court concludes that Retirement System's losses are not comparable to those of Johal, and axiomatically not to those of Johal and McGee combined.
Retirement System also argues that the PLSRA prefers institutional investors as lead plaintiffs, and then cites to cases where courts have chosen institutional investors over individuals when their losses are comparable. (See Ret. Sys. Br. at 6-8). It is true that several courts have found that the PSLRA's legislative history embodies a preference for institutional investors serving as lead plaintiffs. E.g. , In re Gentiva Sec. Litig ., 281 F.R.D. at 113 (collecting cases). Whatever the merits of that position may be-the preference is not embodied in the statutory text in any respect-that preference has been "determinative" when an "institutional investor has a slightly lower loss than another potential lead plaintiff." Id. But as discussed above, Retirement System does not have a "slightly lower" loss than Johal and McGee, and the Court rejects the contention (based on an analysis of all four Olsten factors) that the financial interests are comparable.
The Court therefore concludes that Johal and McGee have the largest financial interest in relief sought by the class.
B. Rule 23
The next step in identifying which plaintiff is entitled to the presumption is to "ensure that the person (or persons) with the largest financial interest 'otherwise satisfies the requirements of Rule 23.' " Maliarov v. Eros Int'l PLC , No. 15-CV-8956, 2016 WL 1367246, at *5 (S.D.N.Y. Apr. 5, 2016) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc) ). In a PSLRA motion to appoint lead plaintiff, the Court considers only whether the proposed plaintiff has made a "preliminary showing" that two of Rule 23's requirements-typicality and adequacy-are satisfied. See Ford v. Voxx Int'l Corp. , 14-CV-4183, 2015 WL 4393798, at *3 (E.D.N.Y. July 16, 2015) (collecting cases); see also Martingano v. Am. Int'l Grp., Inc. , 06-CV-1625, 2006 WL 1912724, at *4 (E.D.N.Y. July 11, 2006) (quotations and citations omitted) ("[A]t this stage in the litigation, one need only make a preliminary showing that the Rule's typicality and adequacy requirements have been satisfied.").
Typicality is satisfied "where the claims arise from the same course of events and each class member makes similar legal arguments to prove defendant's liability." In re Symbol Techs., Inc. Secs. Litig. , 05-CV-3923, 2006 WL 1120619, at *3 (E.D.N.Y. Apr. 26, 2006) (citing Robinson v. Metro-North Commuter R.R. Co. , 267 F.3d 147, 155 (2d Cir. 2001) ). There is no dispute among the Movants that each of their claims arise out of the same course of *423 events-the two Form 20-F filings and the allegedly false and misleading statements contained therein-and that each will make similar legal arguments (under the various provisions of the Exchange Act and Rule 10b-5 thereunder). Consequently, the Court concludes that Johal and McGee, the class members with the largest financial information, have satisfied their burden to make a preliminary showing of typicality.
The adequacy requirement is satisfied where "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) the class members' interests are not antagonistic to one another; and (3) the class has a sufficient interest in the outcome of the case to ensure vigorous advocacy." In re Symbol Techs., Inc. Secs. Litig. , 2006 WL 1120619, at *3 (citing In re eSpeed, Inc. Sec. Litig. , 232 F.R.D. 95, 102 (S.D.N.Y. 2005) ; see also In re Initial Public Offering Sec. Litig. , 214 F.R.D. 117, 121 (S.D.N.Y. 2002) ).
Johal and McGee are represented by two firms, Pomerantz and Rosen, and each appears to be qualified and experienced counsel who have litigated numerous class actions and the Court concludes they would generally be able to conduct this litigation. (See Lieberman Decl., Ex. D (Resume of Pomerantz firm) & Ex. E (Resume of Rosen firm) ). E.g. , In re Symbol Techs., Inc. Sec. Litig. , 2006 WL 1120619, at *3. Nothing about their interests appears to be antagonistic to the interests of the other class members; this appears to be a fairly common class action based on alleged violations of the Exchange Act where class members are relying on the same statements or omissions as the factual basis of their claims, and where the financial losses are tied to the drop in value that occurred after a specific statement or omission took place. E.g. , In re Gentiva Sec. Litig ., 281 F.R.D. at 121 ("In this case, LACERs' claims, similar to the other members of the proposed class, arise from their reliance on allegedly false and misleading statements in purchasing Gentiva shares during the class period. Moreover, ... there is nothing to suggest that LACERs' claims are markedly different from other class members."). Finally, as noted earlier Johal and McGee have suffered alleged losses greater than $140,000 and thus have a sufficient financial interest in the case's outcome to suggest they will pursue the case with vigor.
Neither of the two other Movants makes any argument to suggest otherwise. However, Retirement System makes a separate adequacy argument: that Johal and McGee are inadequate Lead Plaintiffs because they have "been cobbled-together for the sole purpose of aggregating losses in an attempt to obtain lead plaintiff appointment." (Ret. Sys. Br. at 2).
The PLSRA permits a "person or group of persons" to be appointed Lead Plaintiff. See 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The majority of courts permit unrelated investors to join together as a group, and evaluate a motion to do so on a case-by-case basis, evaluating whether the grouping best serves the interest of the class. Accord Varghese v. China Shenghuo Pharm. Holdings, Inc ., 589 F.Supp.2d 388, 392 (S.D.N.Y. 2008). In making such a determination Courts have examined: "(i) the size of the [group]; (ii) any evidence that the group was formed in bad faith; and (iii) the relationship between the parties." Barnet v. Elan Corp. , 236 F.R.D. 158, 162 (S.D.N.Y. 2005) (internal citations omitted).
Retirement System does not question whether the size of a group of two individuals is too large to permit both Johal and McGee being named Lead Plaintiffs. With respect to the other two factors, Retirement System argues that the group was formed not as a result from any pre-existing relationship between Johal and McGee, *424 but is simply the result of law firms attempting to have the Court name two firms as lead counsel. They point out that McGee's certification only authorizes one firm (Rosen) to file a complaint; Johal's certification does not reference any law firm; and neither certification references the other investor. (See Ret. Sys. Br. at 2-3).
The objection is without merit. It is not the case that where there are co-lead plaintiffs there must be some pre-existing, pre-litigation relationship between them. Howard Gunty Profit Sharing Plan v. CareMatrix Corp. , 354 F.Supp.2d 18, 24 (D. Mass. 2000) ("It is not necessary that proposed lead plaintiffs have a pre-litigation relationship[.]"). Nothing in the PSLRA requires such a relationship for groups or class members jointly appointed. And as Johal and McGee both point out, courts routinely appoint unrelated class members as co-lead plaintiffs. See In re eSpeed, Inc. Sec. Litig. , 232 F.R.D. at 99 n.18 (collecting cases and noting that majority view is that unrelated investors could join forces if other requirements of adequacy were satisfied). Johal and McGee have submitted a Joint Declaration that evidences that they are "like-minded investors"; have participated in joint conference calls to discuss litigation strategy; and elect to have both Pomerantz and Rosen serve as their counsel. (See Joint Declaration in Support of Motion for Appointment dated October 30, 2017 ("Joint Decl.") at ¶¶ 4-6, attached as Ex. A to Reply Declaration of Jeremy A. Lieberman). The absences that Retirement System identifies in Johal and McGee's prior declarations are cured by the Joint Declaration, which also provides sufficient assurances that the two investors are capable of working together if chosen as Lead Plaintiffs.[8]
The cases cited by Retirement System do not counsel a different result. In Buettgen v. Harless , 263 F.R.D. 378 (N.D. Tex. 2009), the Court had no evidence that either of the proposed groups of individuals had communicated internally in any meaningful way, and the submitted declarations were nothing more than statements about the losses suffered and the securities purchased. Id. at 381-82. The present case is different, because of the Joint Declaration, which is detailed, focused on the issues of cooperation and demonstrated an understanding of the need for cooperation on an ongoing basis.[9] In *425 In re Petrobras Securities Litigation , 104 F.Supp.3d 618 (S.D.N.Y. 2015), the proposed groupings involved members located in different countries, or entire pension systems located in different states, the members of some of the groups had unique defenses unavailable to other group members, and there were material factual distinctions between the claims members could assert. Id. at 622-23. Such complexities are absent from the present case.
It is certainly possible to identify cases in which unrelated investors were deemed not to be adequate representatives and lead plaintiff designation was provided to another class member. That is the inexorable conclusion of a case-by-case approach.[10] But the predominant feature of such cases is that the aggregation of class members is done solely to create an artificially large financial interest. E.g. , Buettgen , 263 F.R.D. at 382 ("Like the Buettgen Group, the Lyman Group has provided no rationale for this grouping other than to manufacture the greatest financial interest in order to be appointed lead plaintiff.") (citations and quotations omitted); In re Petrobras Sec. Litig ., 104 F.Supp.3d at 622 ("A plaintiff group will generally be rejected if the court determines that it is simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as lead plaintiff.") (citations and quotations omitted); Lifestyle Investments, LLC v. Amicus Therapeutics, Inc. , No. 15-CV-07448, 2016 WL 3032684, at *6 (D.N.J. May 26, 2016) ("I will not permit the Public Pension Funds to aggregate their losses to achieve the largest financial loss."). In the present case, however, Johal standing alone would still have the largest financial interest in the case, one larger than Retirement System. As such, potential lead plaintiffs are not being deprived of the PSLRA presumption by the aggregation of parties. At that point, the adequacy concern should be focused on whether the aggregation is otherwise problematic-if for example, the joinder is of members with competing or diverting interests. And as explained earlier, the traditional inquiry on those issues suggests no such problem with the joinder of Johal and McGee.
Consequently, the Court concludes that Johal and McGee have satisfied the Rule 23 typicality and adequacy requirements, and with the largest financial loss, are entitled to a presumption that they are the most adequate plaintiffs.
C. Rebuttal of the Presumption
The presumption "may be rebutted only upon proof" that Johal and McGee "will not will not fairly and adequately protect the interests of the class" or are "subject to unique defenses that render [them] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Retirement System's arguments about the improper relationship between Johal and McGee are, as explained above, without merit; in any event, they do not rise to the level, even if true, of suggesting that they could not fairly and adequately protect class members' interests. Nor has there been any suggestion that Johal and McGee are subject to unique defenses.
*426 On January 29, 2018, Retirement System provided the Court with supplemental authority, Abouzied v. Applied Optoelectronics, Inc. , No. 17-CV-2399, 2018 WL 539362 (S.D. Tex. Jan. 22, 2018), it believes supports its position. In Abouzied , the court relied on, among other things, cases in the Fifth Circuit that rejected co-lead plaintiff groups composed of more than five members, id. at *4, to reject a proposed group of 12 movants. The Court did find that the proposed group had no pre-existing relationship and was a lawyer-led coalition, whose joint declaration was deemed to be insufficient in areas which the Court found problematic. Id. at *6. That there are courts that reject certain proposed groupings is to be expected. But, ultimately, the question is whether there is reason to believe that the proposed co-lead plaintiffs could not adequately represent the interests of the case such that the Court should override the PSLRA's presumption and preference to appoint the investor(s) with the largest financial loss as lead plaintiff. In this case, where Johal's financial loss alone is still larger than Retirement System's loss, adding one individual investor to serve as co-Lead Plaintiff does not render the group inadequate, simply because there is some theoretical possibility that they could not resolve potential disputes between them, and in the absence of any PSLRA requirement that co-lead plaintiffs have some pre-litigation relationship. See Freudenberg v. E*Trade Fin. Corp. , No. 07-CV-10400, 2008 WL 2876373, at *4 (S.D.N.Y. July 16, 2008) ("A group consisting of persons that have no pre-litigation relationship may be acceptable as a lead plaintiff candidate so long as the group is relatively small and therefore presumptively cohesive.") (collecting cases).
The Court therefore concludes that the presumption has not been rebutted, and Johal and McGee are hereby appointed as Lead Plaintiffs.
II. Lead Counsel
Under the PSLRA, "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). Johal and McGee are represented by Pomerantz and Rosen. As discussed earlier, both are experienced in securities class action litigation, supra at 422, and have been appointed by District Judges in this Court to serve as Lead Counsel. See, e.g. , In re Blue Apron Holdings, Inc. Sec. Litig. , No. 17-CV-4846, 2017 WL 6403513, at *4 (E.D.N.Y. Dec. 15, 2017). The Court sees no reason to not adhere to Johal and McGee's choice: Pomerantz and Rosen are appointed Co-Lead Class Counsel.
Conclusion
For the reasons stated, the Court appoints Kulwant Johal and Matthew McGee as Lead Plaintiffs and Pomerantz LLP and the Rosen Law Firm P.A. as Co-Lead Class Counsel. The other motions for appointment as Lead Plaintiff are denied.
SO ORDERED.

Shillito v. Sequans Communications S.A., et al. , 2:17-CV-4707 (E.D.N.Y.) ("Shillito Compl.").

Unless otherwise indicated, docket citations are to the lead case docket, No. 17-4665.

See Fed. R. Civ. P. 6(a)(1)(C) ("The following rules apply in computing any time period ... [w]hen the period is stated in days ... include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").

Net funds expended during the class period is the difference between the amount spent to purchase shares ($721,574) and the amount received for the sale of shares during the class period ($8966). This calculation is based on the fact that McGee sold 2750 shares on 7/11/2017 and 7/12/2017, which are dates within the class period, and received $8966 from those sales. (See Lieberman Decl., Ex. C). Johal also sold Sequans shares, but only after the class period. (See id. ).

Net shares purchased during the class period is the difference between the shares purchased (193,695) and the number of shares sold during the class period (2750).

Searing concedes that Johal and McGee have the largest financial interest. (See Dkt. No. 18, Notice of Non-Opposition at 1.).

Retirement System also appends an unpublished order in which Judge Kaplan declined to follow the PSLRA presumption even though the moving party had $165,000 more in losses. It is evident that that decision was driven by the failure of the party with the largest loss to choose an experienced law firm. See Freedman v. Weatherford Int'l Ltd. , No. 12-CV-2121, at 2 (S.D.N.Y.) (order dated July 10, 2012). ("But much more important, Sacramento-Anchorage has chosen a large, well known, and able law firm that long has specialized in this sort of litigation. Dr. Siddiqui, on the other hand, has chosen a five-person law firm, the resume of which indicates that it has offices in Nassau County, New York, Beverly Hills, Bala Cynwyd and Cherry Hill, New Jersey (which suggests that it perhaps is spread rather thinly) and discloses only very limited experience in securities class action litigation."), attached as Ex. 1 to October 24, 2017 Decl. of Jay Eng in Support of Retirement System's Motion.

It is of no moment that the Joint Declaration was filed after the motion for lead counsel was filed, since the PSLRA does not impose a timing requirement on submissions. See In re Blue Apron Holdings, Inc. Sec. Litig. , No. 17-CV-4846, 2017 WL 6403513, at *4 (E.D.N.Y. Dec. 15, 2017) ("[T]he PSLRA does not require that any such evidence be submitted with the initial motion[.]"). And the cases cited by Retirement System, (see Ret. Sys. Br. at 10 n.7), are instances where a court has rejected co-lead counsel treatment, not because the supporting declaration was filed after the motion for appointment was filed, but because the evidence submitted was not sufficient to change the court's decision.

Retirement System also cites to a variety of cases described as instances where courts rejected co-lead plaintiff groupings because there was no evidence about group decisionmaking or conflict resolution. (Ret. Sys. Br. at 9-10). Setting aside whether such a requirement exists under the PLSRA or Rule 23, those cases are inapposite or actually support Johal and McGee. For example, in Ross v. Abercrombie & Fitch Co. , the proposed co-lead plaintiffs did not submit any evidence about their relationship, and relied exclusively on the declaration of a lawyer representing the group. 2007 WL 895073, at *4 (S.D. Ohio Mar. 22, 2007). That is not the case here. In Howard Gunty Profit Sharing Plan v. CareMatrix Corp., the Court did approve the grouping of two individual plaintiffs, who had no pre-litigation relationship, but provided a declaration about the nature of their cooperation. See 354 F.Supp.2d 18, 24-5 (D. Mass. 2000). That is similar to the declaration submitted in this case. In any event, in attesting to manage the litigation efficiently, achieve the best possible result for the class, and the actions they would take to effectuate that purpose, the Joint Declaration gives sufficient comfort that there is no disharmony or risk to other class members from the joining of Johal and McGee. The Joint Declaration need not spell out chapter and verse their conflict resolution mechanisms in the manner Retirement System argues is necessary.

Cases run both ways. Indeed, at least one of the cases cited by Retirement System, the Court approved the grouping of multiple entities as co-lead plaintiff, (see Ret. Sys. Br. at 9). E.g. , In re Cendant Corp. Litig ., 264 F.3d 201, 270 (3d Cir. 2001).